## INTERSTATE NATURAL GAS CO., INC. *v.* FEDERAL POWER COMMISSION ET AL.

No. 733.   Argued May 2, 1947.—Decided June 16, 1947.

*William A. Dougherty* argued the cause for petitioner. With him on the brief were *Henry P. Dart, Jr.* and *James Lawrence White.*

By special leave of Court, *James D. Smullen,* Assistant Attorney General, argued the cause for the State of Texas et al., as *amici curiae,* urging reversal. With him on the brief was *Price Daniel,* Attorney General.

*Charles E. McGee* argued the cause for the Federal Power Commission, respondent. With him on the brief were *Acting Solicitor General Washington* and *Louis W. McKernan.*

Briefs of *amici curiae* were filed in support of petitioners by *Mac Q. Williamson,* Attorney General, for the State of Oklahoma; and *Donald C. McCreery, Wesley E. Disney, Charles I. Francis, Russell B. Brown, L. Dan Jones, Forrest M. Darrough, Hiram M. Dow, Walace Hawkins, Harold L. Kennedy, L. G. Owen* and *William Henry Rector* for the Independent Natural Gas Association of America et al.

MR. CHIEF JUSTICE VINSON delivered the opinion of the Court.

This case originated in proceedings before the Federal Power Commission initiated pursuant to § 5 (a) of the

Natural Gas Act of 1938.[1]   After overruling objections to its jurisdiction, the Commission entered an order requiring the petitioner to effect substantial rate reductions in certain of its sales of natural gas and to file new schedules of rates and charges.[2]   Petitioner, in seeking review of the order in the Circuit Court of Appeals, denied the jurisdiction of the Commission to set rates for the sales in issue in this case and asserted that the rates so established were confiscatory.   That Court, one judge dissenting, denied the petition for review.[3]   We granted certiorari limited to the question of the Commission's jurisdiction.

Petitioner owns and operates 110 natural gas wells and owns or controls over 56,000 acres in the Monroe field of northern Louisiana.   Petitioner's main pipe line transports gas southward from the Monroe field through a part of Mississippi and back into Louisiana, where at Baton Rouge sales are made to various distributing companies and industrial consumers.   Petitioner concedes that with respect to these operations it is a natural gas company within the meaning of § 2 (6)[4] of the Act and that the Commission has jurisdiction to regulate the rates of sales connected therewith.

The issue of this case involves the jurisdiction of the Federal Power Commission to regulate sales made in the field by petitioner to three pipe-line companies, each of which transports the gas so purchased to markets in States other than Louisiana.[5]   Gas produced from petitioner's

---

[1] 52 Stat. 821, 15 U. S. C. § 717 *et seq.;* 56 Stat. 83.

[2] 3 F. P. C. 416.

[3] 156 F. 2d 949 (1946).

[4] Section 2 (6) provides: " 'Natural-gas company' means a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale."

[5] The three companies include the Mississippi River Fuel Corporation, Southern Natural Gas Company, and the United Gas Pipe Line Company to which gas is sold for the account of the Memphis Natural Gas Company.

wells flows into petitioner's system of field pipe lines, moving first into branch lines, then into trunk lines, and finally into the main trunk lines from which delivery is made to the three purchasing companies. During the course of this movement petitioner purchases gas from other producers in the field which gas is introduced into petitioner's system at designated points and is there commingled with the gas moving from petitioner's own wells. By far the larger part of the gas so purchased by petitioner has been gathered from various wells of the selling companies before delivery to petitioner is made.[6] The gas moves through petitioner's system at well pressure. Shortly after the sales in question are completed, the gas is directed through the compressor stations of the purchasing companies and is there subjected to increased pressure in order that it may be moved to markets as far distant as Illinois. The entire movement of the gas from the wells to the purchasing companies through the compressor pumps and across the state lines is a continuous process without interruption for storage, processing or for any other purpose.[7] All the gas sold in these transactions is destined for ultimate public consumption in States other than Louisiana.

It appears that petitioner supplies only a part of the gas purchased by the three pipe-line companies in the Monroe

---

[6] Petitioner produced and purchased a total of 51,659,799 Mcf of gas in the Monroe field during 1941. Of this total, petitioner produced from its own wells 28,819,814 Mcf. Of the 22,839,985 Mcf purchased, 95% was gathered by the producers before delivery to petitioner; the remaining 5% was purchased by petitioner directly at the well heads. Petitioner sold 21,863,278 Mcf to the three purchasing companies in the transactions in question.

[7] Gas in the Monroe field is "dry" gas and consequently is not subjected to any extraction processing. Before moving into the compressor pumps the gas is run through a series of "scrubbers" which remove dirt and foreign particles. This is accomplished, however, without interruption in the movement.

field.[8]   Counsel for petitioner conceded before the Commission that the prices charged the three pipe-line companies were, by agreement, identical with those being charged by other producers in the field.   The Commission found that petitioner was an affiliate of one of the three purchasing companies.   It was the conclusion of the Commission that the rates charged by petitioner in these sales were "unjust, unreasonable and unlawful" and ordered rate reductions amounting to $596,320 per year as applied to the volume of gas sold in the test year of 1941.

Petitioner has at no time contended that regulation of its sales to the three purchasing companies is beyond the constitutional powers of Congress.   Petitioner has vigorously asserted, however, that Congress did not exercise its full powers in the Natural Gas Act and that in § 1 (b) of the Act the jurisdiction of the Federal Power Commission is so limited as to preclude valid regulation of the sales by that agency.   Section 1 (b) provides:

"The provisions of this Act shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas."

It is not denied that the transactions in question were sales of natural gas for resale for ultimate public consumption.

---

[8] The transactions in question supply the Mississippi Fuel Corp. with 22% of its requirements, 24% of the requirements of the Memphis Natural Gas Co., and 16.61% of the requirements of Southern Natural Gas Co.

Petitioner has raised two issues: First, it is contended, the sales are not "in interstate commerce." Second, the sales are a part of "production or gathering" and hence not within the Commission's power of regulation.

We have no doubt that the sales are in interstate commerce. Indeed, petitioner did not contest that position before the Commission, but, so far as the record reveals, raised the issue for the first time in its petition for rehearing in the Circuit Court of Appeals.[9] The Federal Power Commission found that the gas sold to the three pipe-line companies moves ". . . in a constant flow from the mouths of the wells from which it is produced through pipe lines belonging to Interstate to the compressor station of the respective purchaser, and thence through said compressor stations into the pipe line of said respective purchaser and thus into and through states other than Louisiana . . . , all without interruption, and said gas is so destined from the moment of its production." The Commission further found that "The gas transported and sold by Interstate to these three pipe line companies continues its flow in interstate commerce and, as an established course of business well known to Interstate, is destined for resale for ultimate public consumption in . . . markets outside Louisiana."

Under the circumstances described by the Commission, it is clear that the sales in question were quite as much in interstate commerce as they would have been had the

---

[9] In its complaint filed in the District Court for the Eastern District of Louisiana invoking the equity powers of the Court to restrain the Louisiana Public Service Commission from conducting an investigation into petitioner's rates and charges, petitioner specifically asserted that the sales in question are in interstate commerce and thus beyond the jurisdiction of the state commission. The District Court granted the requested relief. *Interstate Natural Gas Co.* v. *Public Service Commission,* 33 F. Supp. 50; 34 F. Supp. 980 (1940).

pipes of the petitioner crossed the state line before reaching the points of sale.[10]   Thus in *Public Utilities Commission* v. *Attleboro Steam & Electric Co.,* 273 U. S. 83 (1927), a sale of electrical energy at the state line was held to be in interstate commerce.   Commenting on that case, this Court in *Jersey Central Power & Light Co.* v. *Federal Power Commission,* 319 U. S. 61, 69 (1943) stated: "We see no distinction between a sale at or before reaching the state line."   There is nothing in the terms of the Act or in its legislative history to indicate that Congress intended that a more restricted meaning be attributed to the phrase "in interstate commerce" than that which theretofore had been given to it in the opinions of this Court.[11]   Section 2 (7) of the Act defines "interstate commerce" as ". . . commerce between any point in a State and any point outside thereof, or between points within the same State but through any place outside thereof, . . . ."   Clearly the sales in question were a part of commerce being carried on between points in Louisiana and points in other States.   There is nothing in that language to suggest that Congress intended that sales consummated before the gas crosses a state line should not be regarded as being "in" such commerce.

---

[10] *Shafer* v. *Farmers Grain Co.,* 268 U. S. 189 (1925); *Lemke* v. *Farmers Grain Co.,* 258 U. S. 50 (1922); *Dahnke-Walker Milling Co.* v. *Bondurant,* 257 U. S. 282 (1921).   And see *Illinois Natural Gas Co.* v. *Central Illinois Public Service Co.,* 314 U. S. 498, 503–504 (1942); *Currin* v. *Wallace,* 306 U. S. 1, 10 (1939); *Peoples Natural Gas Co.* v. *Public Service Comm'n,* 270 U. S. 550, 554 (1926); *Illinois Central R. Co.* v. *Railroad Comm'n,* 236 U. S. 157, 163 (1915).   Cf. *Milk Control Board* v. *Eisenberg Farm Products,* 306 U. S. 346 (1939).

[11] *Illinois Natural Gas Co.* v. *Central Illinois Public Service Co.,* 314 U. S. 498, 508 (1942); *Peoples Natural Gas Co.* v. *Federal Power Comm'n,* 75 U. S. App. D. C. 235, 127 F. 2d 153 (1942).   Cf. *Jersey Central Power & Light Co.* v. *Federal Power Comm'n,* 319 U. S. 61, 70–71 (1943).

Nor are we impressed with the suggestion that the interstate movement of the gas should be regarded as beginning when the gas, theretofore moving through petitioner's pipe line system at well pressure, is subjected to increased pressure in the compressor stations of the purchasing companies in order that the gas may be moved to the distant markets. Long before the gas reaches the compressor pumps it has been committed to its interstate journey which follows without interruption or deviation. Under such circumstances, the increase of pressure in the compressor stations must be regarded as merely an incident in the interstate commerce rather than as its origin.[12]

The Company contends, however, that regardless of whether the sales in question are in interstate commerce, those transactions fall within the clause of § 1 (b) specifically excepting from the Commission's jurisdiction regulation of ". . . the production or gathering of natural gas." In evaluating that contention we should not lose sight of the objectives sought to be accomplished by Congress in passing the Natural Gas Act.

In a series of decisions announced prior to the passage of the Act, this Court had held that, although Congress had not acted, the regulation of wholesale rates of gas and electrical energy moving in interstate commerce is beyond the constitutional powers of the States.[13] Petitioner, relying in part upon the principles established by those cases, has successfully avoided regulation by the Louisiana

[12] Cf. *Illinois Natural Gas Co.* v. *Central Illinois Public Service Co., supra* at 504–505; *State Tax Comm'n* v. *Interstate Natural Gas Co.,* 284 U. S. 41, 44 (1931).

[13] *Missouri* v. *Kansas Natural Gas Co.,* 265 U. S. 298 (1924); *Public Utilities Comm'n* v. *Attleboro Steam & Electric Co.,* 273 U. S. 83 (1927); *State Corp. Comm'n* v. *Wichita Gas Co.,* 290 U. S. 561 (1934).

Public Service Commission.[14]   As was stated in the House Committee report, the "basic purpose" of Congress in passing the Natural Gas Act was "to occupy this field in which the Supreme Court has held that the States may not act."[15]   In denying the Federal Power Commission jurisdiction to regulate the production or gathering of natural gas, it was not the purpose of Congress to free companies such as petitioner from effective public control.   The purpose of that restriction was, rather, to preserve in the States powers of regulation in areas in which the States are constitutionally competent to act.   Thus the House Committee Report states: "The bill takes no authority from State commissions, and is so drawn as to complement and in no manner usurp State regulatory authority . . . ."[16] Clearly, among the powers thus reserved to the States is the power to regulate the physical production and gathering of natural gas in the interests of conservation or of any other consideration of legitimate local concern.[17] It was the intention of Congress to give the States full freedom in these matters.   Thus, where sales, though technically consummated in interstate commerce, are made during the course of production and gathering and are so closely connected with the local incidents of that process as to render rate regulation by the Federal Power Commission inconsistent or a substantial interference with the exercise by the State of its regulatory functions, the jurisdiction of the Federal Power· Commission does not attach.[18]   But such conflict must be clearly shown.   Ex-

---

[14] See note 9, *supra.*

[15] H. R. Rep. No. 709, 75th Cong., 1st Sess., 2.

[16] *Ibid.*

[17] *Colorado Interstate Gas Co.* v. *Federal Power Comm'n,* 324 U. S. 581, 602–603 (1945).

[18] The Federal Power Commission has not asserted jurisdiction over all sales taking place in the natural gas fields even though in

ceptions to the primary grant of jurisdiction in the section are to be strictly construed. It is not sufficient to defeat the Commission's jurisdiction over sales for resale in interstate commerce to assert that in the exercise of the power of rate regulation in such cases, local interests may in some degree be affected.[19]

There is nothing in the record to indicate that the regulation in question is in any way inconsistent with the exercise by Louisiana of the powers over production and gathering of natural gas reserved to it by Congress in § 1 (b) of the Act. The State in a series of enactments has made elaborate provision for the conservation of its natural gas resources and has established various rules and regulations relating to the production and gathering process.[20] Most of those provisions, presumably, are applicable to petitioner's field operations.[21] The record is devoid of any suggestion that Louisiana has ever opposed the jurisdiction of the Federal Power Commission in this case or has ever urged that federal regulation of the sales in question would interfere with the exercise by the State of its regulatory functions.[22] We do not suggest that the

---

interstate commerce for resale for ultimate public consumption. *In the Matter of Columbian Fuel Corp.*, 2 F. P. C. 200; *In the Matter of Billings Co.*, 2 F. P. C. 288. We express no opinion as to the validity of the jurisdictional tests employed by the Commission in these cases.

[19] Cf. *Colorado Interstate Gas Co.* v. *Federal Power Comm'n, supra* at 603; *Federal Power Comm'n* v. *Hope Natural Gas Co.*, 320 U. S. 591, 607–612 (1944).

[20] La. Gen. Stat. §§ 4766–4826.2.

[21] The record contains testimony by counsel for petitioner to the effect that these provisions apply to petitioner and that petitioner's operations have conformed with their requirements.

[22] Counsel for the Louisiana Public Service Commission and for two Louisiana municipalities participated in the proceedings before the Federal Power Commission.

jurisdiction of the Commission in any case is to be determined by the resistance or lack of resistance on the part of the State to federal regulation. But in evaluating the Company's contention that the State's powers have been invaded, we regard it a matter of some significance that although the State has freely exercised its regulatory powers over the production and gathering of natural gas, there is no evidence of any conflict, present or threatened, in the performing of those functions by the State with the exercise of the jurisdiction of the Federal Power Commission in this case.

It is not contended that the Commission is precluded from regulating the sales in question by reason of the exception from the Commission's jurisdiction relating to the production of natural gas. Petitioner asserts, however, that the sales to the three pipe-line companies are a part of the gathering process and consequently not within the Commission's power of regulation. This basic contention· has given rise to a great many subsidiary questions such as whether the sales were made from petitioner's "gathering" lines or from petitioner's "transmission" lines and whether the gathering process continued to the points of sale or was, as the Commission found, completed at some point prior to surrender of custody and passage of title. We have found it unnecessary to resolve those issues. The gas moved by petitioner to the points of sale consisted of gas produced from petitioner's wells commingled with that produced and gathered by other companies and introduced into petitioner's pipe-line system during the course of the movement. By the time the sales are consummated, nothing further in the gathering process remains to be done. We have held that these sales are in interstate commerce. It cannot be doubted that their regulation is predominately a matter of national, as contrasted to local concern. All the gas sold in these transactions is destined

for consumption in States other than Louisiana. Unreasonable charges exacted at this stage of the interstate movement become perpetuated in large part in fixed items of costs which must be covered by rates charged subsequent purchasers of the gas, including the ultimate consumer.[23] It was to avoid such situations that the Natural Gas Act was passed.

For reasons stated above, we have concluded that the Federal Power Commission in this case has not exceeded the jurisdiction conferred upon it by Congress in § 1 (b) of the Natural Gas Act.

*Affirmed.*

---

[23] A number of cases in this Court have held that the reasonableness of cost items such as that incurred by a purchasing pipe-line company in acquiring gas for transportation may be inquired into during the course of subsequent regulation when buyer and seller are affiliated corporations and there is evidence that the sales were not made at arm's length. The Commission found affiliation to exist between petitioner and only one of the three purchasing companies, the Mississippi River Fuel Corporation. There was a finding of "close contractual and operating arrangements" between petitioner and another of the purchasing companies. *Natural Gas Pipeline Co.* v. *Slattery,* 302 U. S. 300 (1937); *Columbus Gas & Fuel Co.* v. *Public Utilities Comm'n,* 292 U. S. 398 (1934); *Dayton Power & Light Co.* v. *Public Utilities Comm'n,* 292 U. S. 290 (1934); *Western Distributing Co.* v. *Public Service Comm'n,* 285 U. S. 119 (1932); *Smith* v. *Illinois Bell Telephone Co.,* 282 U. S. 133 (1930); *United Fuel Gas Co.* v. *Railroad Comm'n,* 278 U. S. 300 (1929).