**FEDERAL POWER COMMISSION,**
Plaintiff,

v.

**J. M. HUBER CORPORATION,**
Defendant.

No. 244–55.

United States District Court
D. New Jersey.
Aug. 16, 1955.

Willard W. Gatchell, Gen. Counsel, William J. Grove, Asst. Gen. Counsel, Harry L. Albrecht, Commission Staff Counsel, Washington, D. C., for plaintiff.

Wise & Wise, Red Bank, N. J., by William T. Wichmann, Red Bank, N. J., Henry H. Fowler, Washington, D. C., Alexander B. Hawes, Robert Martin, Washington, D. C., of counsel, for defendant.

FORMAN, Chief Judge.

The defendant, J. M. Huber Corporation, is a New Jersey corporation which holds leasehold interests in twelve natural gas wells in Carson County, Texas.[1] The gas produced from these wells is sold by Huber to the Northern Natural Gas Company pursuant to a contract between Huber and Northern entered into on April 21, 1936. The contract is to remain effective during the life of Huber's leaseholds. However, the contract has an escape clause, whose terms are not here relevant, which Huber is trying to invoke.

Pursuant to what it regarded as its right under the contract, Huber gave Northern notice on September 1, 1954 in writing that it intended to cancel the gas purchase contract made April 21, 1936 in 180 days thereafter. It is the contention of the Commission that Huber cannot cease operation under its contract with Northern since Section 7(b) of the Natural Gas Act provides:

"No natural-gas company shall abandon * * * any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment." 15 U.S.C. § 717f(b).

Notwithstanding its expressed desire to cancel its contract with Northern, on September 24, 1954 Huber set in motion with the Federal Power Commission applications for certificates of public convenience or necessity. Apparently to fulfill technical requirements it first asked for approval of its sale of gas to Northern, specifically however, reserving its right to protest the legality of and applicability to it of Commission Order 174–a (regulations governing the filing of rate schedules and applications for certificates of public convenience and necessity by producers and gatherers of natural gas * * *). This application was designated Docket G–3038 by the Commission. On the same day Huber filed with the Commission a "notice of cancellation" of the rate schedule, consisting of copies of its letter to Northern of September 1, 1954 terminating its contract. It covered the copies with a letter to the Commission in which it said: "Reserving our protest that the sale of gas to Northern Natural Gas Company is not a sale subject to the jurisdiction of the Commission, we request that, in the event that the Commission does have jurisdiction over the sale, it grant express permission and approval to the cancellation and abandonment of said sale on March 1, 1955, pursuant to the terms and provisions of said contract dated April 21, 1936." This was given Docket No. G–4957 by the Commission as an applica-

---

1. Only eleven of Huber's Carson County wells produce gas over the sales of which the Commission is attempting to assert jurisdiction since one of the wells, located at a point remote from the others, produces gas gathered and consumed wholly within Texas.

tion pursuant to Section 7(b) .of the Natural Gas Act for permission to abandon service.

Northern filed a petition to intervene in Docket No. G–3038 and a complaint designated Docket No. G–4326 against Huber for its cancellation of its contract and threatened termination of deliveries. It also filed a protest and a petition to intervene with respect to Huber's cancellation of rate schedules designated No. G–4957. Northern was permitted to intervene.

On December 30, 1954 an order (adopted December 15, 1954) was issued by the Commission rejecting Huber's "Notice of Cancellation of its rate schedule covering its sale to Northern," fixing the date of hearing on January 26, 1955, and consolidating Docket Nos. G–4326 and G–4957 for purposes of hearing on that date.

On January 14, 1955, Huber filed a document entitled "Withdrawal of Application for Public Convenience and Necessity" in which it stated that "it is not now and has not been since September 1, 1954, willing to do the acts and perform the services proposed * * *". It further stated that if Huber was not permitted to withdraw its application in Docket G–3038 that it be amended to state that it was not willing to do the acts or perform the services proposed and is not willing to conform to the provisions of Section 7(e) of the Natural Gas Act and the requirements, rules and regulations thereunder. It further stated by way of amendment that it was not willing to accept a certificate covering the sale and also that the application for a certificate of public convenience and necessity was filed because of the possibility that Huber would be subject to penalties under the Natural Gas Act for failure to so file.

On January 25, 1955 Huber filed two petitions, one for a declaratory order to terminate the controversy and remove uncertainty with reference to the above-entitled proceedings and the other complaining against Northern for failure to obtain a certificate of public convenience and necessity for the facilities used primarily for the purpose of transporting the gas purchased from Huber. They were respectively designated Docket Nos. G–8111 and G–8112.

On January 26, 1955 hearings were commenced in G–3038, G–4326 and G–4957.

On January 27, 1955 Huber filed a withdrawal of the Notice of Cancellation which it had filed on September 24, 1954, designated Docket No. G–4957, on the ground that Northern's facilities had not been certificated.

The hearing was concluded on January 28, 1955, and briefs were filed by all parties on March 23, 1955.

After being notified of Huber's intention to discontinue its sale to Northern on March 10, 1955 without Commission approval and prior to a determination of the matters before it, the Commission, on March 9, 1955, began this proceeding seeking an injunction under Section 20(a) of the Natural Gas Act [2] restraining Huber from violating Section 7(b) of the Act by proceeding to discontinue its sale to Northern.

A temporary restraining order was issued and extended. A stipulation of facts has been filed by the parties and they have agreed that it, the oral argument and their briefs submitted on the motion for preliminary injunction shall serve as the basis for decision as if on final hearing.

This Court cannot enjoin Huber from discontinuing its sale to Northern unless

---

2. "Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this Act, or of any rule, regulation, or order thereunder, it may in its discretion bring an action in the proper district court of the United States * * * to enjoin. such acts or practices and to enforce compliance with this act or any rule, regulation, or order thereunder, and upon a proper showing a permanent or temporary injunction or decree or restraining order shall be granted * * *." 15 U.S.C. § 717s(a).

the jurisdictional provision—Section 1(b)—has given the Commission power to apply Section 7(b) to Huber's sale to Northern. Section 1(b) provides:

"The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas." 15 U.S.C. § 717(b).

The eleven of Huber's wells in suit here are located at varying distances from each other along approximately 8 miles of pipeline, which runs as follows: (1) Along a line of 6 and 10 inch pipe, from west to east, to which five wells are connected; (2) thereafter the line which is 10 inches bends to the southeast and two wells are connected to it, (3) then there is a section of 10 and 8 inches which runs directly north and south; (4) from there the line of 6 inches veers to the southwest with a well located at its beginning and end. The section (3) running north and south is intersected by (5) a 4 and 6 inch line running from east to west with a well connected to each of its extremities. Midway between the beginning of the north-south section (3) and the intersection of the line (5) a

short length of pipe of two to three feet extends to the east forming the stem of a "T". A system of valves permits the gas from all eleven wells to be collected in this stem. The pipeline of Northern, running westerly, connects with the eastern end of the stem and takes the Huber gas. It is at this point that the sale by Huber to Northern takes place. A few feet from the mouth of the "T" and inserted in Northern's pipeline is a meter which measures the quantity of gas flowing from the Huber system into Northern's pipelines. Once in the Northern pipeline Huber's gas is commingled with gas purchased by Northern from other producers; is compressed slightly to facilitate travel to another compressor station where all the gas purchased in the area by Northern is cleansed, further compressed, and sent into Northern's interstate pipeline. In the normal course of business gas from Huber's wells flows continuously through the two compressor stations into the interstate pipeline.

■ Huber is not engaged in the "transportation of natural gas in interstate commerce" as the Commission conceded. The Commission has jurisdiction over Huber under Section 1(b) only if it is found that it is engaged in "the sale in interstate commerce of natural gas for resale * * *". And since it is conceded that Huber's sale to Northern is for resale, the issue of this case may be stated simply as—whether or not Huber's sales to Northern are sales in interstate commerce as that term is used in the Natural Gas Act.[3]

3. Any argument that Huber's sales are a necessary incident of its production and gathering activities and therefore exempt from Commission jurisdiction under 1(b) because that jurisdiction specifically does not extend to the " 'production or gathering of natural gas' " is foreclosed by the decision in Phillips Petroleum Co. v. Wisconsin, 1954, 347 U.S. 672, 677–678, 74 S. Ct. 794, 797, 98 L.Ed. 1035, where it was held that the specific exemptions mentioned at the close of Section 1(b) are explanatory merely and in no way affect the preceding grant of jurisdiction. This means that the preclusion of Commission juris-

diction over the " 'production or gathering of natural gas' " in no way limits or diminishes the grant of jurisdiction over " 'the sale in interstate commerce of natural gas for resale.' " In short, as the words are used in Section 1(b) a sale in interstate commerce for resale can never be part of the producing and gathering process. The words "shall not apply to * * * the production or gathering of natural gas" are not in diminution of the preceding grant of jurisdiction, but serve merely to mark its boundaries.

Congress has supplied the Natural Gas Act with its own definition of interstate commerce:

" 'Interstate commerce' means commerce between any point in a State and any point outside thereof, or between points within the same State but through any place outside thereof, but only insofar as such commerce takes place within the United States." 15 U.S.C. § 717a(7).

Huber's sale to Northern at the converging point of its gas gathering lines falls squarely within a literal view of this language, for it is conceded that Huber's gas maintains a continuous flow through its gathering lines into its interstate journey. The interstate journey begins, at the latest, when the gas leaves Huber's gathering lines, if not before, and any argument that the interstate journey commences only after the gas is placed under the compression necessary to move it interstate has already been rejected. Interstate Natural Gas Co. v. Federal Power Comm., 1947, 331 U.S. 682, 689, 67 S.Ct. 1482, 91 L.Ed. 1742. "* * * the increase of pressure in the compressor stations must be regarded as merely an incident in the interstate commerce rather than as its origin." 331 U.S. at page 689, 67 S.Ct. at page 1486.

This might end this portion of the case were it not for some limitations upon the scope of "interstate commerce" as that term is used in the Gas Act. It is well-settled that in enacting the Natural Gas Act in 1938 Congress intended to provide a federal agency with power to regulate commerce in natural gas only in those areas in which the Supreme Court had held state regulation to be in violation of the Commerce Clause. Illinois Natural Gas Co. v. Central Illinois Public Service Co., 1942, 314 U.S. 498, 506–508, 62 S.Ct. 384, 86 L.Ed. 371; Interstate Natural Gas Co. v. Federal Power Comm., 1947, 331 U.S. 682, 687–691, 67 S.Ct. 1482, 91 L.Ed. 1742; Phillips Petroleum Co. v. Wisconsin, 1954, 347 U.S. 672, 684 and 685–687,

74 S.Ct. 794 (concurring opinion). It is equally settled that the boundary line between state and federal regulation which Congress intended to draw by enacting Section 1(b) of the Natural Gas Act was the identical line the Supreme Court had at that time placed as marking the outer limit of state authority. Section 1(b) is thus to be construed in the light of what the extent of state constitutional power was thought to be in 1938; latter-day decisions expanding the permissible scope of state regulation over interstate commerce are irrelevant to discovery of what Congress meant in 1938 with the enactment of Section 1(b). Panhandle Eastern Pipe Line Co. v. Public Service Comm., 1947, 332 U.S. 507, 516, 68 S.Ct. 190, 92 L.Ed. 128; Federal Power Comm. v. East Ohio Gas Co., 1950, 338 U.S. 464, 471–472, 70 S.Ct. 266, 94 L.Ed. 268.

There is at least a reasonable doubt that at the time the Natural Gas Act was enacted the applicable decisions would have permitted a state to regulate or prohibit the sales in question here. Public Utilities Comm. v. Attleboro Steam & Elec. Co., 1927, 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed. 549, held that a sale at wholesale at a state line of electricity by its producer was a sale in interstate commerce beyond state regulation. State of Oklahoma v. Kansas Natural Gas Co., 1911, 221 U.S. 229, 31 S.Ct. 564, 55 L.Ed. 716, forbade Oklahoma to prohibit the sale of natural gas for interstate consumption. It was the rule of the Attleboro case that played a large part in prompting Congress to enact the Natural Gas Act, and in large measure it was the purpose of the Act to provide regulation for sales like that in controversy in Attleboro. Federal Power Comm. v. Panhandle Eastern Pipe Line Co., 1949, 337 U.S. 498, 509–510 note 15, 69 S.Ct. 1251, 93 L.Ed. 1499. With the Attleboro case as historical background for the Act and the broad specification in Section 1(b) that the Commission is to have jurisdiction over "the sale in interstate commerce of natural gas for resale" it is difficult to believe

that 1(b) was not designed to cover such a sale as that in question here.

Huber relies heavily on Federal Power Commission v. Panhandle Eastern Pipe Line Co., 1949, 337 U.S. 498, 69 S. Ct. 1251. The controversy there also revolved around the scope of jurisdiction delegated to the Commission by Section 1 (b). Panhandle wished to dispose of leases of natural gas reserves and the Commission sought to regulate their disposition. Upon the refusal of Panhandle to obey the Commission's order to preserve the *status quo* pending administrative decision, the Commission sought injunctive relief, just as it is doing here. The Supreme Court, however, determined that in 1(b) Congress had not granted the Commission such power and specifically held that trading in gas leases was trading in an "essential part of production" 337 U.S. at page 505, 69 S.Ct. at page 1256, and hence beyond the authority granted. 337 U.S. at pages 509–514, 69 S.Ct. at page 1258–1260. But Huber's reliance on the Panhandle case is misplaced. To say that the Commission has no authority over the real property interests a natural gas company acquires or relinquishes has little relevancy to a decision on jurisdiction over a sale at a point where production and gathering have ceased. In this case Huber has not attempted to sell or dispose of its interest in its gas wells, but rather seeks to terminate the flow of the product of the wells—the gas.

Though it is recognized that the Supreme Court in Interstate Natural Gas Co. v. Federal Power Comm., 1947, 331 U.S. 682, 67 S.Ct. 1482, 91 L.Ed. 1742, said:

"Thus, where sales, though technically consummated in interstate commerce, are made during the

course of production and gathering and are so closely connected with the local incidents of that process as to render rate regulation by the Federal Power Commission inconsistent or a substantial interference with the exercise by the State of its regulatory functions, the jurisdiction of the Federal Power Commission does not attach." 331 U.S. at page 690, 67 S.Ct. at page 1487.

I am convinced that the Huber-Northern sale in this case is not in the same situation contemplated by that dictum. This case is more closely governed by the actual decision in the Interstate case and that in Phillips Petroleum Co. v. Wisconsin, 1954, 347 U.S. 672, 74 S.Ct. 794.[4]

In the Interstate case, gas from its wells moved at wellhead pressure through its gathering lines, in which it was mingled with gas purchased from other producers, and was then sold to pipeline companies which compressed and processed it for travel and consumption in interstate commerce. After holding that the sale by Interstate was a sale in interstate commerce within the somewhat limited meaning of that phrase in the Natural Gas Act, the Court went on to reject Interstate's contention that the sale by it was an incident of "gathering gas" and thus within the exception to 1(b):

"It is not contended that the Commission is precluded from regulating the sales in question by reason of the exception from the Commission's jurisdiction relating to the production of natural gas. Petitioner asserts, however, that the sales to the * * * pipe-line companies are a part of the gathering process and consequently not within

4. The quoted dictum from the Interstate case may take on significance in the light of the decisions in Cities Service Gas Co. v. Peerless Oil & Gas Co., 1950, 340 U.S. 179, 71 S.Ct. 215, 95 L.Ed. 190, and Phillips Petroleum Co. v. Oklahoma, 1950, 340 U.S. 190, 71 S.Ct. 221, 95 L.Ed. 204. Placing great emphasis on the interests of the states in conserving natural re-

sources the Court in both cases held state price regulation of sales in interstate commerce made at the *wellhead* not to violate the Commerce Clause. But the question of conflict between such state regulation and the Natural Gas Act was specifically reserved. 340 U.S. at pages 188–189, 71 S.Ct. 220–221.

the Commission's power of regulation. This basic contention has given rise to a great many subsidiary questions such as whether the sales were made from petitioner's 'gathering' lines or from petitioner's 'transmission' lines and whether the gathering process continued to the points of sale or was, as the Commission found, completed at some point prior to surrender of custody and passage of title. We have found it unnecessary to resolve those issues. The gas moved by petitioner to the points of sale consisted of gas produced from petitioner's wells commingled with that produced and gathered by other companies and introduced into petitioner's pipe line system during the course of the movement. By the time the sales are consummated, nothing further in the gathering process remains to be done. We have held that these sales are in interstate commerce. It cannot be doubted that their regulation is predominately a matter of national, as contrasted to local concern. All the gas sold in these transactions is destined for consumption in states other than Louisiana. Unreasonable charges exacted at this stage of the interstate movement become perpetuated in large part in fixed items of costs which must be covered by rates charged subsequent purchasers of the gas including the ultimate consumer. It was to avoid such situations that the Natural Gas Act was passed." 331 U.S. at pages 692–693, 67 S.Ct. at page 1488.

Phillips Petroleum Co. v. Wisconsin, supra, is the mainstay of the Commission's argument. Phillips produced, gathered, and processed gas which it then sold in interstate commerce to pipeline companies. The issue was the authority of the Commission under 1(b) to regulate the sale by Phillips.[5] Relying heavily on its Interstate decision, supra, and giving the exceptions to 1(b) the clarifying rather than limiting construction detailed in note 3, supra, the Court went on to hold that

"* * * we believe that the legislative history indicates a congressional intent to give the Commission jurisdiction over the rates of all wholesales of natural gas in interstate commerce, whether by a pipeline company or not and whether occurring before, during, or after transmission by an interstate pipeline company." 347 U.S. at page 682, 74 S.Ct. at page 799.

It would appear that this language includes the activities of Huber here in issue.

Moreover, a construction of 1(b) to include Huber's sale to Northern is supported by inferences from Congressional reaction to several proposed amendments to 1(b) whose specific purpose was to deprive the Commission of the jurisdiction it now asserts before this Court. Such legislation was mentioned in the Panhandle case with the notation that "Congress is now giving consideration to this problem". 337 U.S. at pages 516–517, note 25, 69 S.Ct. at page 1262. It was never enacted. An ambitious program, contemplating a complete revision of the Natural Gas Act, passed the House in 1947 but died in the Senate. H.R. 4051, 80th Congress, 1st Sess. One of the provisions of this unsuccessful bill was a limitation on Commission jurisdiction specifically exempting inde-

5. A subordinate issue in the Phillips case and in this case also is whether the producer is a "Natural Gas Company" within the meaning of the Act. Since the Act defines Natural Gas Company as "a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale" 15 U.S.C. § 717a(6), and

1(b) gives jurisdiction over Huber only if it is engaged in "the sale in interstate commerce of natural gas for resale" in this case the same legal criteria and conclusions govern both the issue of the Commission's jurisdiction under 1(b) and whether or not Huber is a Natural Gas Company under Section 2(6) of the Act.

pendent producers like Huber. In a sense, then, Huber is now asking this court to do for it what the Senate of the United States would not do then.

Two years later less ambitious programs of amendment of the Natural Gas Act failed of passage. This time the assaults were directed solely at the coverage of Section 1(b). Nearly identical bills, H.R. 79 and H.R. 1758 were introduced in the 81st Congress, 1st Sess., each with a single purpose—to free the independent producer and gatherer who sold gas in interstate commerce to interstate pipeline companies from any possibility of Commission regulation.[6] And a proposal to the same effect was simultaneously made in the Senate. S. 1498, 81st Congress, 1st Sess. Furthermore, at this time Congress was warned that the Commission, which had previously refused to assert its jurisdiction over sales by independent producers,[7] had now shifted its policy, and that such jurisdiction would probably be asserted if necessary unless legislation intervened.[8] The jurisdictional coverage of 1(b) remained unaltered.[9] The opponents of extensive Commission jurisdiction carried the fight to reduce the Commission's jurisdiction to the floor of the House in the session just concluded. H.R. 6645, 84th Cong., 1st Sess. H.R. 6645 had as its object the overthrow of the Phillips case, and it passed the House by a very narrow margin, 209–203. See 101 Cong. Record, 10232–10317. The Senate, however, adjourned without considering the measure. See N.Y. Times of July 29, 1955, pg. 1, col. 8.

The plain meaning of 1(b) together with its broad construction in the Interstate and Phillips cases plus the consistent refusal of Congress to alter 1(b) in the face of repeated assurances that independent producers and gatherers like Huber were within its terms, all lead to the conclusion that the Commis-

6. The introducer of H.R. 79 and one of his constituents thought that once Commission jurisdiction attached to a sale by an independent producer and gatherer under the present wording of 1(b) the sales could not be abandoned without Commission approval, thus agreeing with the Commission's position in this case. Testimony of Hon. John E. Lyle, Jr., Hearings before Subcommittee of Committee on Interstate and Foreign Commerce on H.R. 79, 81st Congress, 1st Sess., p. 21. See also the testimony of Hayden W. Head, id. at p. 99.

7. On August 7, 1947, following the Interstate case, supra, the Commission promulgated order 139 which read in part:
"For the purpose of administering the Natural Gas Act, the Commission will construe the exemption contained in Section 1(b), to the effect that the provisions of the Act shall not apply to the production or gathering of natural gas, as including arm's length sales of natural gas by independent producers and gatherers, made during the course or upon completion of production and gathering. The Commission, consistent with this construction, will not assert jurisdiction over such producers and gatherers who might be subject to jurisdiction solely be-

cause of such sales." 18 C.F.R. § 2.54 (1949 ed.).

8. Federal Power Commission Report on H.R. 79, H.R. 1758, Hearings before a Subcommittee of the Committee on Interstate and Foreign Commerce, 81st Congress, 1st Sess. p. 167.

9. H.R. 1758 and S. 1498, known as the Kerr Bill, passed but did not survive President Truman's veto on April 15, 1950. 96 Cong.Rec. 5304 (1950). His veto message is contained in 1950 U.S. Code Cong.Serv. p. 1366.
Nor has there been a consistent administrative interpretation of Section 1(b) to aid the courts in its construction. In addition to the instances of Commission fluctuation over the extent of coverage afforded by 1(b) cited by Mr. Justice Minton in the Phillips case, 347 U.S. at page 678, note 5, 74 S.Ct. 794, a few more could be added. For example, the Commission supported H.R. 4009, 80th Congress, 1st Sess., a bill designed to accomplish the same purpose as H.R. 79 and H.R. 1758, 81st Congress, 1st Sess., which the Commission opposed. Compare the Commission's position in the Phillips case, where it resisted the jurisdiction it now seeks from this Court.

sion rightfully asserts jurisdiction over Huber's sales to Northern.

Huber makes further contentions, none of which I find supportable now. It is said that no matter the extent of jurisdiction under 1(b), the Commission is precluded from applying Section 7(b) to Huber's proposed abandonment of its sales to Northern because 7(b) requires Commission approval of abandonment only where the abandonment is to be of "facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities" and that Huber has no facilities "subject to the jurisdiction of the Commission". There are two short answers to this contention. First, the Supreme Court has already intimated that the application of 7(b) is as broad as the jurisdiction of the Commission under Section 1(b). Federal Power Commission v. Panhandle Eastern Co., 1949, 337 U.S. 498, 507–509, 69 S.Ct. 1251, 93 L.Ed. 1499. Second, this Court has already held that Huber's sales to Northern are within the Commission's jurisdiction and since a sale of natural gas cannot be made without the use of facilities, power to control the sale includes power over facilities and thus Huber does have "facilities subject to the jurisdiction of the Commission" within the meaning of 7(b). See Hartford Electric Light Co. v. Federal Power Comm., 2 Cir.1942, 131 F.2d 953, certiorari denied 1943, 319 U.S. 741, 63 S.Ct. 1028, 87 L.Ed. 1698.

In the course of its argument Huber poses the broad question of whether or not the Commission has power under Section 7(e) of the Act, 15 U.S.C. § 717f (e), to issue a certificate of public convenience and necessity to one who is a private person and not a public utility and who is unwilling to accept Commission jurisdiction. But Huber is not in this position. Of course one not already subject to the jurisdiction of the Commission may make a voluntary choice whether he will perform acts which, in turn, will subject him to the power of the Commission. As has been shown, Huber engaged in conduct which has brought it within the jurisdiction of the Commission.

■ Huber also claims that any construction of the act that would permit the Commission to apply the power delegated to it to prevent the abandonment of sales under 7(b) to the Huber-Northern sales would lead to a violation of the Fifth Amendment. These contentions need not be discussed, for they are premature. It is settled that a Federal Court possesses jurisdiction to adjudicate a constitutional controversy " * * * only when the interests of litigants require the use of this judicial authority for their protection against *actual* interference." United Public Workers v. Mitchell, 1947, 330 U.S. 75, 89–90, 67 S.Ct. 556, 564, 91 L.Ed. 754. (Emphasis added.) Where there is a possibility that a case may be disposed of on non-constitutional grounds, constitutional adjudication must be deferred. Alma Motor Co. v. Timken-Detroit Axle Co., 1946, 329 U.S. 129, 136–137, 67 S.Ct. 231, 91 L.Ed. 128. The Commission has not yet applied 7(b) to Huber's activities; indeed, it may never do so. All the Commission asks, and all that this Court holds, is that the Commission has power to determine whether or not Section 7(b) should be utilized. Once the Commission has made a final determination, Huber may find itself free and without a constitutional issue to litigate, and if it has one, it will be clearly defined and not hypothetical. See Aircraft & Diesel Corp. v. Hirsch, 1947, 331 U.S. 752, 772–773, 67 S.Ct. 1493, 91 L.Ed. 1796.

Huber insists that the Commission cannot lawfully "require the continued delivery of natural gas by a producer or gatherer under circumstances which render such delivery illegal under the Natural Gas Act because neither the facilities owned by the producer or gatherer and used to deliver the gas, (Huber) nor the facilities owned by the interstate pipeline used to receive the gas and deliver it to the main system (Northern)

can be properly or are in fact certificated under Section 7 of the Natural Gas Act (15 U.S.C. § 717f(c))". Whether the facilities "can be properly * * * certificated" is an issue for the Commission's primary adjudication. Aircraft & Diesel Corp. v. Hirsch, 1947, 331 U.S. 752, 67 S.Ct. 1493. Even assuming *arguendo* that neither Huber's nor Northern's facilities are certificated (there is controversy as to whether Northern has been certificated) Huber is not aided thereby. Section 7(c) of the Act which requires certification places a duty to be certificated upon natural gas companies. It does not purport to diminish the jurisdiction of the Commission under Section 1(b). Furthermore, it is almost too plain to require statement that Huber should not now be permitted to take advantage of its or Northern's past failure to obtain certification if 7(c) required it. The plea that if the Commission orders Huber to continue its sales to Northern, the Commission will be ordering an act in violation of 15 U.S.C. § 717t, under which criminal liability might be imposed upon Huber, does not insulate Huber from an order by the Commission denying abandonment of its sale to Northern if the Commission has jurisdiction under Section 1(b).

Huber will be enjoined from discontinuing its sales for resale to Northern pending final Commission decision on the issue of whether or not Huber should be permitted to abandon its sale under Section 7(b) of the Natural Gas Act, 15 U.S.C. § 717f(b).[10]

The foregoing shall be regarded as providing findings of fact and conclusions of law as required by Rule 52, Federal Rules of Civil Procedure, 28 U.S.C.

An order in conformity with this opinion shall be submitted by the plaintiff for settlement on notice to the defendant.

10. As has been heretofore indicated, Huber's twelfth well, which produces gas purchased and consumed by Northern wholly within Texas, at one of its compressor stations, is not affected by these proceedings.