CITY OF NEW ORLEANS, STATE OF
LOUISIANA, et al.

v.

UNITED GAS PIPE LINE COMPANY

GULF STATES UTILITIES COMPANY

v.

UNITED GAS PIPE LINE COMPANY

LOUISIANA POWER & LIGHT
COMPANY

v.

UNITED GAS PIPE LINE COMPANY
and Pennzoil Company.

Civ. A. Nos. 74–2049, 74–2324, 74–2659.

United States District Court,
E. D. Louisiana.

Dec. 6, 1974.

862

Blake G. Arata, Jacob Taranto, III, New Orleans, La., for City.

W. C. Nelson, New Orleans, La., Clayton L. Orn, Houston, Tex., for N. O. Public Service.

Orgain, Bell & Tucker, Beaumont, Tex., Taylor, Porter, Brooks & Phillips, Baton Rouge, La., for Gulf States Utilities Co.

Andrew P. Carter, New Orleans, La., for La. Power & Light Co.

Harry B. Kelleher, Ernest L. Edwards, C. Murphy Moss, New Orleans, La., William B. Cassin, Phillip D. Endom, Perry O. Barber, Houston, Tex., for United Gas Pipe Line Co.

Gene W. Lafitte, New Orleans, La., for Pennzoil Co.

ALVIN B. RUBIN, District Judge:

█ In yet another battle of the legal war that may fix the burden of, and determine who may profit from, the nationwide shortage of natural gas,[1] Louisiana Power & Light (LP&L), Gulf States Utilities (GSU), and New Orleans Public Service, Inc. (NOPSI), all of whom purchase natural gas from United Gas Pipeline Co., Ltd. (United) and are classified as direct sales purchasers,[2] filed suit in Louisiana state court against United for damages resulting from its failure to deliver the amounts of gas specified in the contracts between the parties. The plaintiffs alleged that various forms of misconduct had led to the breach of contract: United's release of existing but non-producing gas purchase contracts,[3] its failure to acquire new reserves, and its undertaking contracts for new sales at the expense of old customers. In addition, LP&L joined Pennzoil Co. as a defendant, alleging that Pennzoil had acquired control of United and depleted United's assets, thus contributing to United's inability to meet its contractual obligations to LP&L.

All the plaintiffs contend that their actions are based on violations of state law, including the provisions of the Louisiana Civil Code and the Louisiana Antitrust Law, R.S. 51:121, 51:122; they state that they have no claims that invoke federal law; and the face of each

---

1. These parties have been litigating before the FPC and the courts ever since it became evident that United would not be able to meet its contract commitments. For the history of the conflict, see Comment, FPC Natural Gas Allocation: Curtailment in Context, 50 Texas L.Rev. 1370, 1391–1408 (1972); and State of Louisiana v. FPC, 5th Cir. 1974, 503 F.2d 844.

2. The Natural Gas Act distinguishes sales for resale to pipelines and "city gate distributors," and direct sales to industrial users and electrical utilities. 15 U.S.C. § 717(b). While the FPC has jurisdiction over all transportation of natural gas in interstate commerce, and therefore may curtail deliveries to direct sales purchasers, FPC v. Loui-

siana Power & Light, 1972, 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369, the Commission has no jurisdiction over interstate sales to direct sales purchasers.

3. As the Act prohibits abandonment of facilities subject to the jurisdiction of the Commission, 15 U.S.C. § 717f, a different case might be presented if United were charged with the release of producing leases. See United Gas Improvement Co. v. Continental Oil Co., 1965, 381 U.S. 392, 85 S.Ct. 1517, 14 L.Ed.2d 466. A non-producing property, however, is not a "facilit[y] subject to the jurisdiction of the Commission." FPC v. Panhandle Eastern Pipeline Co., 1949, 337 U.S. 498, 69 S.Ct. 1251, 93 L.Ed. 1499.

petition filed in state court supports this contention. All three cases were removed to federal court and consolidated. The plaintiffs have moved to remand, claiming that no federal question is presented.[4] The defendants insist that the cases involve federal questions because the plaintiffs' claims arise under the Natural Gas Act, 15 U.S.C. § 717 et seq., or alternatively, under the federal common law, which they claim governs at least some of the aspects of the buyer-seller relationship in this area.

## THE WELL-PLEADED COMPLAINT

■■ Whether a complaint initially filed in federal court properly invokes federal jurisdiction, or whether a federal question is presented in a state court proceeding sought to be removed, must of course be determined at the inception of the suit. The question might be resolved by an attempt to predict the issues that might eventually arise in the case, either by way of defense or in support of the plaintiffs' claims, and by attempting to anticipate whether counterclaims, cross-claims, third party complaints or other ancillary demands would likely be filed and endeavoring to prophesy the ultimate issues raised by each. Such an undertaking would be time-consuming and, to a degree, speculative. Hence, the Supreme Court early developed the well-pleaded complaint rule: the federal question must appear on the face of the well-pleaded complaint. See

Wright, Law of Federal Courts 59 (1970).

■ Here, each of the plaintiffs professes to rely solely on state law as a basis for its claims. To create federal jurisdiction it is not sufficient that the defendants may have a well-founded defense under the Natural Gas Act or the rulings of the FPC:[5] the federal question must be presented in the state court complaint for the case to be removable. 1A Moore's Federal Practice ¶ 160 (1974). Unless state law has been preempted by the Natural Gas Act or by federal common law, there is no federal question that could serve as a fundament for federal jurisdiction in pleadings like the complaints before the Court. 1A Moore's Federal Practice ¶ 160 (1974).

## THE NATURAL GAS ACT

The defendants assert that of necessity these suits involve federal questions. Their first thesis is that the claims must be resolved under the Natural Gas Act. The contention that contractual claims between parties to a natural gas contract arise under the Natural Gas Act is not res nova; similar arguments were presented to the United States Supreme Court in Pan American Petroleum Co. v. Superior Court of Delaware, 1961, 366 U.S. 656, 81 S.Ct. 1303, 6 L. Ed.2d 584. Although the contentions were presented in a different context, that decision involved issues indistinguishable from those presented here.[6]

---

4. Defendants make no allegations of diversity.

5. The power of the FPC and the propriety of its immunization of pipelines against damage suits for breach of contract has been the subject of much agency, judicial, and doctrinal literature. See FPC Order 606, Docket Nos. RP 71–120, RP 71–99, United Gas Pipe Line Co., 46 FPC 786 (October 5, 1971); FPC Order 606–A, Docket Nos. RP 71–29, RP 71–120, RP 71–99, United Gas Pipe Line Co., 46 FPC 1290 (December 3, 1971); reviewed in International Paper Co. v. FPC, 5th Cir. 1973, 476 F.2d 121; FPC Order 647–A, Docket Nos. RP 71–29, RP 71–120,

United Gas Pipe Line Co. (May 30, 1973); reviewed in State of Louisiana v. FPC, 5th Cir. 1974, 503 F.2d 844; Comment, The Liability of Natural Gas Pipeline Companies for Breach of Contract Due to FPC-Ordered Curtailment, 1973 Duke Law J. 867 (1973).

6. In the instant cases, the defendants claim that the plaintiffs' claim is within the FPC's transportation jurisdiction, citing FPC v. Louisiana Power & Light, 1972, 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369. In Pan American, the plaintiff's claims dealt with sales for resale, and the rates were thus within the FPC sales jurisdiction. See 15 U.S.C. § 717 (b).

In *Pan American*, to comply with a state rate order, the gas purchaser paid sums in excess of the price fixed in its contract with a gas supplier under protest. After the state rate order was held invalid by the United States Supreme Court as conflicting with the jurisdiction of the FPC, the purchaser sued in state court for a rebate of the overpayments. The seller then sought a writ of prohibition to halt the proceeding, claiming the suit sought to enforce a rate order of the FPC and was therefore within the exclusive jurisdiction of the federal courts under 15 U.S.C. § 717u. The Supreme Court held that the state court had jurisdiction to entertain the claim for the rebate.

While the issue presented in *Pan American* was whether federal jurisdiction was exclusive, the Court was careful to point out that, before federal jurisdiction is exclusive by virtue of 15 U.S.C. § 717u, the case must arise under the Natural Gas Act:

> Nor does § 22 of the Natural Gas Act help petitioners. "Exclusive jurisdiction" is given the federal courts but it is "exclusive" only for suits that may be brought in the federal courts. Exclusiveness is a consequence of having jurisdiction, not the generator of jurisdiction because of which state courts are excluded. 366 U.S. at 664, 81 S.Ct. at 1308.

Jurisdiction, the court said, is "not determined by ultimate substantive issues of federal law." 366 U.S. at 662, 81 S.Ct. at 1307. The necessity of construction of the Natural Gas Act and FPC orders did not confer jurisdiction; jurisdiction depends on "how he [the suitor] casts his action." 366 U.S. at 662, 81 S.Ct. at 1307.

■ We need not consider whether the plaintiffs might have attempted to cast their claims under federal law. They have already attacked FPC immunization orders directly before the FPC and by appeal to the Fifth Circuit;[7] but they did not then assert claims for money damages for alleged violation of state law. Here they have couched their claims in terms of state contract and tort law, and that determines that the claims do not *arise under* the Natural Gas Act. "The rights asserted," as the Court observed in *Pan American*, "are traditional common-law claims. They do not lose their character because it is common knowledge that there exists a scheme of federal regulation of interstate transmission of natural gas." 366 U.S. at 663, 81 S.Ct. at 1307.

## FEDERAL COMMON LAW

■ The *Pan American* decision does not foreclose the possibility that the claims urged by the plaintiffs arise under a federal common law governing this aspect of the natural gas industry.[8] It is therefore necessary to consider separately the defendants' claims that the federal nature of the issues requires the application of federal law, thus preempting state law. If state law is preempted by the federal nature of the issue, then in the absence of a statute, federal judge-made law, or, as it is sometimes called, federal common law must be applied to resolve the controversy. The complaints would then necessarily involve the application of federal law and present a federal question.

Federal common law has been invoked when the rights of the United States are involved, Clearfield Trust Co. v. United States, 1943, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838; when the issues concern interstate boundaries or pollution, Illinois v. City of Milwaukee, 1972, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712;

---

7. See note 5, *supra*.

8. The Court in *Pan American* was presented only with the question whether the claim arose under the Natural Gas Act and was therefore within the exclusive jurisdiction provision of the Act, 15 U.S.C. § 717u.

While a claim arising under the federal common law is sufficient to invoke federal question jurisdiction, Illinois v. City of Milwaukee, 1972, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712, it will not confer exclusive jurisdiction.

when there appears to be a Congressional mandate to do so, Textile Workers Union of America v. Lincoln Mills of Alabama, 1957, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972; and when a pervasive scheme of federal regulation indicates a Congressional objective that cannot be attained without the application of a uniform body of law, Ivy Broadcasting Co. v. American Tel. & Tel., 2d Cir. 1968, 391 F.2d 486.

The defendants premise that a determination of the scope of the Natural Gas Act should take into account the national energy shortage, and the paramount national weal; in their view, thus considered, the Act so pervades the area of natural gas supply that national uniform rules of law must be applied to resolve disputes of the kind here involved.

■ The Supreme Court has said, "Whether latent federal power should be exercised to displace state law is primarily a decision for Congress," Wallis v. Pan American Petroleum Co., 1966, 384 U.S. 63, 86 S.Ct. 1301, 16 L.Ed.2d 369. Federal courts should therefore be reluctant to appropriate the legislative function at the expense of the states' power to govern areas traditionally within state competence. We look then first to Congressional intent.

■ The Supreme Court has repeatedly expressed the opinion that Congress intended regulation of the natural gas industry to be a joint state-federal enterprise. See, e. g., FPC v. Transcontinental Gas Pipe Line Corp., 1961, 365 U.S. 1, 81 S.Ct. 435, 5 L.Ed.2d 377; FPC v. East Ohio Gas Co., 1950, 338 U.S. 464, 70 S.Ct. 266, 94 L.Ed. 268; FPC v. Panhandle Eastern Pipeline Co., 1949, 337 U.S. 498, 69 S.Ct. 1251, 93 L.Ed. 1499; Panhandle Eastern Pipeline Co. v. Public Service Comm'n of Indiana, 1947, 332 U.S. 507, 68 S.Ct. 190, 92 L.Ed. 128; Interstate Natural Gas Co. v. FPC, 1947, 331 U.S. 682, 67 S.Ct. 1482, 91 L.Ed. 1742. The Natural Gas Act was passed to regulate only those areas that were beyond the constitutional bounds of state regulatory power under the commerce clause theory of the day, and the Act therefore confirms state authority to that extent. The House Committee on Interstate and Foreign Commerce report on the bill that became the Natural Gas Act makes this evident.[9] In Panhandle Eastern Pipeline Co. v. Public Service Comm'n of Indiana, 1947, 332 U.S. 507, 516, 68 S.Ct. 190, 195, 92 L.Ed. 128, the Supreme Court delineated the narrow scope of federal regulation:

> three things and three only Congress drew within its own regulatory power, delegated by the Act to its agent, the Federal Power Commission. These were: (1) the transportation of natural gas in interstate commerce; (2) its sale in interstate commerce for resale; and (3) [the regulation of] natural gas companies engaged in such transportation or sale.

The legislation was thus carefully fashioned to exert federal control only in a limited and well-defined area. It would distort that pattern beyond recognition to find inherent in this plan a proscription of state legislation allowing parties to contract to sell natural gas in interstate commerce, or of state law prescribing liability for the breach of such a contract. The FPC may regulate many aspects of the gas-supply contract, its administrative rulings may undertake to immunize the defendants from liability for adhering to them, but not even that agency has attempted to imply that the contractual relationship is itself a creature of federal law.

9. "The States have, of course, for many years regulated sales of natural gas to consumers in intrastate transactions. The States have also been able to regulate sales to consumers even though such sales in interstate commerce, such sales being considered local in character and in the absence of congressional prohibition subject to State regulation. (See Pennsylvania Gas Co. v. Public Service Commission (1920), 252 U.S. 23, [40 S.Ct. 279, 64 L.Ed. 434].) There is no intention in enacting the present legislation to disturb the States in their exercise of such jurisdiction." H.R.Rep.No. 709, 75th Cong., 1st Sess. 1 (1937).

The Second Circuit holding in *Ivy Broadcasting*,[10] that claims of negligence and breach of contract in the supplying of interstate telephone service were governed by federal common law, is readily distinguishable. First, the Federal Communications Act imposes a duty "to furnish . . . communication service upon reasonable request therefor," 47 U.S.C. § 201(a), and permits a suit for damages to be brought by anyone injured by a violation of the Act. 47 U.S.C. §§ 206, 207. Although the *Ivy* court chose not to rely upon these provisions,[11] their existence indicates that the Federal Communications Act is broader in scope than the Natural Gas Act, which contains no correlative provisions. Second, the Second Circuit could look for doctrinal support, if not authority, to the decisions holding that certain incidents of the relationship between the buyer and seller of communications services are governed by federal law, and that the federal legislation has preempted the field. See, e. g., Western Union Tel. Co. v. Speight, 1920, 254 U.S. 17, 41 S.Ct. 11, 65 L.Ed. 104; Western Union Tel. Co. v. Boegli, 1920, 251 U.S. 315, 40 S.Ct. 167, 64 L.Ed. 281; Postal Tel. Cable Co. v. Warren-Godwin Lbr. Co., 1919, 251 U.S. 27, 40 S.Ct. 69, 64 L.Ed. 118. As noted above, the converse is true in the case of the Natural Gas Act: all pronouncements by the Supreme Court have indicated that regulation of the natural gas industry was intended to be a cooperative operation between the state and federal governments.

The court is here called on to act in an area where no constitutional mandate is invoked, and where Congress has the power and the duty to declare national policy. It has been suggested that the breadth of FPC power allowed by the judicial decisions does not conform to Congress' original intention, and that, had the legislative mandate been scrupulously followed much of the current gas shortage could have been avoided.[12] This criticism is sound so far as it is based on legislative interpretation. But so far as it seeks to evaluate the earlier court decisions on the basis that they did, or did not, achieve a sound allotment of natural resources, it misses the point. The question in this narrow area is not whether the courts' reading of the Natural Gas Act as giving broad scope to the FPC created or alleviated the gas shortage, but whether it is for federal courts to attempt to decide what policy would best utilize natural gas supplies. The proponents of the view that federal courts should undertake to assert their judicial competence in the area, and fashion uniform federal rules, argue that a fair allocation of a critical natural resource will thereby more likely be achieved. Whether that proposition is correct is a matter for legislative determination. The concept of division of powers does not contemplate that the courts will fill every presumed vacuum even in times of national need.

Until Congress acts further, the state courts are left to act, conformably with state law, subject to the litigants' ultimate right to appeal to the Supreme Court of the United States if federal law is raised as a matter of defense.

Accordingly, the motions to remand are granted.

---

10. The commentary on the *Ivy* decision has been generally critical, Note, 37 Geo.Wash. L.Rev. 425 (1968); Note, 82 Harv.L.Rev. 479 (1968); Note, 43 Tul.L.Rev. 168 (1968); one writer calling the decision "a pernicious sub rosa attack on state substantive law." Note, 37 Geo.Wash.L.Rev. 425, 431 (1968).

11. The court summarily disposed of the claim that these provisions governed the case, or that a remedy should be "inferred" from the Federal Communications Act. 391 F.2d at 489. Some of the criticism of the case has been leveled at this failure to rely on the legislation available. Note, 82 Harv.L.Rev. 479, 480 (1968).

12. Breyer & MacAvoy, The Natural Gas Shortage and the Regulation of Natural Gas Producers, 86 Harv.L.Rev. 933 (1973); Comment, FPC Natural Gas Allocation: Curtailment in Context, 50 Texas L.Rev. 1370 (1972).