929 F.2d 1261
 124 P.U.R.4th 404
 NORTHERN NATURAL GAS COMPANY, DIVISION OF ENRON CORP., Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Peoples Natural Gas Company, a division of UtiliCorp United
Inc.; Texaco Inc., a Delaware Corporation; Exxon
corporation, a New Jersey corporation; Amoco Production
Company, a Delaware corporation; Mobil Oil Corporation;
Mobil Producing Texas & New Mexico Inc.; Mobil Exploration
and Producing Southeast Inc.; Mobil Exploration and
Producing North America, Inc.; ARCO Oil and Gas Company;
Chevron U.S.A., Inc.; Phillips 66 Natural Gas Company;
Northern States Power Company (Minnesota); Northern States
Power Company (Wisconsin); and Minnesota Utilities, Intervenors.
 Nos. 88-1042, 88-2195 and 88-2588.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 12, 1989.
Decided April 4, 1991.
 
 Gordon Gooch, Washington, D.C., for appellant Mobil.
 George Meiburger, Washington, D.C., for appellant Northern.
 Dwight Alpern, Robert Soloman, Washington, D.C., for appellee FERC.
 R. Gordon Gooch, Washington, D.C., argued, for intervenor Mobil in support of FERC.
 Before LAY, Chief Judge, BROWN*, Senior Circuit Judge, and WOLLMAN, Circuit Judge.
 JOHN R. BROWN, Senior Circuit Judge.
 
 
 1
 This is a procedurally complex case about a fairly straightforward question. Were it not for the inches-deep stack of briefs and records of a years-long controversy confronting us and earnestly urging contradictory applications of the same statute and caselaw, we might be tempted to give too simple an answer.
 
 
 2
 The question is whether the Federal Energy Regulatory Commission (FERC) may, in implementing its "Open Access Order No. 436,"[1] regulate the rates that natural gas pipeline companies charge third-party interstate transportation shippers for moving natural gas on gathering facilities owned by the pipeline.[2]
 
 
 3
 We conclude that the agency may regulate rates charged for transportation on the pipeline's own gathering facilities performed in connection with jurisdictional interstate transportation.
 
 
 4
 To trace our path to this conclusion, we must, as nearly always is so in the world, begin at the beginning.
 
 The Word
 
 5
 FERC, which regulates interstate sales and transportation of natural gas under the Natural Gas Act of 1938 (NGA)[3] and the Natural Gas Policy Act of 1978 (NGPA)[4] adopted Order No. 436 on October 9, 1985, in response to changes in the industry which had been accelerated by the NGPA's alterations in the comprehensive regulatory scheme of the NGA,[5] including the removal of some price controls and the consequent unleashing of competitive forces. The NGPA's deregulatory provisions were generally designed to increase the role of market forces in the natural gas industry.[6]
 
 
 6
 Prior to the adoption of the NGPA, pipeline owners operated primarily as gas merchants, buying gas from producers at the wellhead and shipping it over their own pipelines for sale either to distributors (for resale in the market) or directly to commercial users.
 
 
 7
 One result of increased competition under the NGPA has been that shippers of gas seek "unbundled" transportation services from pipelines. As a gas merchant, a pipeline sold gas and transportation as a package, at a "bundled" sales rate. Today, pipelines still offer such bundled packages, but must also offer transportation service "unbundled" from the sale of gas. The contemporary unbundled-transportation customer is a distribution company or an end user who has purchased the gas directly from the producer or other seller at the wellhead. This "third party" gas competes in the market with gas the pipeline is offering to sell in a bundled package with transportation. Consequently, the Commission found in promulgating Order No. 436 that "the single most important economic change has been that natural gas has become a separate and distinct economic commodity."[7]
 
 
 8
 The Commission sought, in Order No. 436, to facilitate competition in the market for natural gas as a distinct commodity by encouraging pipelines to provide transportation without discriminating against customers whose gas would compete with the pipeline's gas in the market. Without some regulatory scheme, a pipeline could discriminate by refusing to provide transportation services for gas competing with its own, or by charging higher transportation rates for competing gas than for non-competing gas. Such discrimination, if unimpeded, would impair competition, virtually forcing customers to purchase gas from the pipeline at prices bundled with the price of transportation services.[8]
 
 
 9
 Thus, Order No. 436 streamlined the Commission's regulations regarding transportation certificates, while imposing an "open access" condition[9] which requires pipelines to provide transportation services without "undue discrimination or preference."[10] To take advantage of the streamlined certification rules, the pipeline may not refuse to transport "third party" gas purchased from a provider other than the pipeline.[11] In fixing transportation rates under this new regime, the pipelines are required to "separately identify cost components attributable to transportation, storage, and gathering costs."[12]
 
 
 10
 Consequently,
 
 
 11
 Order No. 436 has restructured the role of interstate gas pipelines by opening the use of pipelines to third party gas sellers.... As restructured under open access, pipelines are to serve as transporters of natural gas not only for themselves but for others, even those who might be in competition with the pipeline in its role of gas merchant.[13]
 
 
 12
 These changes have given rise to questions regarding the distinction between gathering and interstate transportation and the regulation thereof under the provisions of the NGA.
 
 
 13
 Gathering and interstate transportation are specifically distinguished in Sec. 1(b) of the NGA:[14]
 
 
 14
 The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.[15]
 
 
 15
 Sections 4(a) and (b) of the NGA[16] also have a significant role in defining the Commission's authority:
 
 
 16
 (a) All rates and charges made, demanded, or received by any natural-gas company for or in connection with the transportation or sale of natural gas subject to the jurisdiction of the Commission ... shall be just and reasonable, and any such rate or charge that is not just and reasonable is declared to be unlawful.
 
 
 17
 (b) No natural-gas company shall, with respect to any transportation or sale of natural gas subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.[17]
 
 
 18
 Section 4(c)[18] requires natural gas companies to file "[u]nder such rules and regulations as the Commission may prescribe ... all rates and charges for any transportation or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges...."[19]
 
 
 19
 Section 4(d)[20] requires 30 days notice by a natural gas company of a rate change unless the Commission for good cause shown allows, by order, a faster change.[21]
 
 
 20
 Section 4(e)[22] grants the Commission the authority to "enter upon a hearing concerning the lawfulness" of proposed rates, permits the Commission to temporarily suspend a rate schedule "pending such hearing," and authorizes the Commission "after full hearings" to make "proper" orders regarding such rates. The burden is placed on the natural gas company to show that increased rates are "just and reasonable."[23]
 
 Section 5(a)[24] provides:
 
 21
 (a) Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality, State commission, or gas distributing company, shall find that any rate, charge or classification demanded, observed, charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice or contract to be thereafter observed and in force, and shall fix the same by order.... [T]he Commission may order a decrease where existing rates are unjust, unduly discriminatory, preferential, otherwise unlawful, or are not the lowest reasonable rates.[25]
 
 
 22
 Gathering, which Sec. 1(b) generally exempts from the provisions of the act, can be performed by a producer, by a pipeline (interstate or intrastate), or by an independent gathering firm. The term "gathering" refers to the process of collecting gas at the point of production (the wellhead) and moving it to a collection point for further movement through a pipeline's principal transmission system.[26] It should be pointed out, however, that the flow of the gas "is continuous from the well head to the ultimate consumer."[27] This is especially significant in this case where the gathering is performed by an interstate pipeline over its own facilities in connection with continuing interstate transportation by the same pipeline.
 
 
 23
 "Transportation" involves the movement of gas through a pipeline's principal transmission system. Transportation facilities which receive natural gas after gathering may conduct transportation in interstate commerce, which is subject to the Commission's jurisdiction under Sec. 1(b), or transportation in intrastate commerce, which is excluded from regulation under the NGA.
 
 
 24
 The NGA provides that tariffs are to be filed "[u]nder such rules and regulations as the Commission may prescribe ... and in such form as the Commission may designate."[28] The Commission is also granted "the power to ... prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this chapter."[29] We have recognized that "an agency's interpretation of the statute that it is charged with administering is entitled to considerable deference."[30] " '[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of the agency.' "[31] Thus we should uphold the Commission's orders if they are not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[32]
 
 
 25
 The three consolidated appeals now before us arise from this regulatory scenario.
 
 The Score
 
 26
 Sometimes one cannot tell the players without a scorecard. In this case, such resort is necessary just to determine the answer to the more obvious and basic question of the score.
 
 The Long and Winding Road
 
 27
 Northern Natural Gas Company is a pipeline company operating an integrated, interstate pipeline system. Some of the services it offers include:
 
 
 28
 1) sales for resale in interstate commerce of natural gas which Northern has purchased (sale by Northern is "bundled" with transportation, gathering and other connected services);
 
 
 29
 2) direct sales ("bundled" with transportation and gathering and other connected services) to end users, of natural gas which it has purchased;
 
 
 30
 3) collecting, at the point of production (the wellhead), natural gas owned by others, and moving the gas over Northern's gathering facilities to a collection point for further movement through its principal transmission ("transportation") facilities; and
 
 
 31
 4) transportation in interstate commerce, through its principal transmission facilities, of natural gas owned by others.
 
 
 32
 It is the fourth service that Order No. 436 is intended to protect from discrimination which would benefit the pipeline's sale of its own gas to the disadvantage of the other, third-party shippers.
 
 
 33
 These proceedings began with a 1985 transportation tariff filing. On April 11 of 1986, Northern filed with the Commission a proposed settlement negotiated with third-party shippers who had challenged that 1985 filing. The settlement offer included an open access transportation proposal under Order No. 436,[33] but included no statement of Northern's charges to interstate transportation customers for gathering performed by Northern on its own facilities in connection with the jurisdictional interstate transportation.
 
 
 34
 In a December 22, 1986 order,[34] the Commission approved the transportation proposal (with some modifications which are not at issue here), but with the specific requirement that Northern separately state its gathering rates in its tariff sheets.[35] The Commission emphasized that:Order No. 436 specifically requires the separate identification of gathering costs. Moreover, there is no record to determine whether the subject services are gathering. However, without rendering an opinion on the question of jurisdiction at this time, we believe it is consistent with Order No. 436 to modify the Settlement to provide that Northern shall reflect its gathering rates in its tariff sheets.[36]
 
 
 35
 Northern petitioned for rehearing,[37] contending that the Commission had no jurisdiction to impose the requirement that gathering rates be stated in the tariff.
 
 
 36
 The Commission affirmed the relevant part of its earlier order on November 9, 1987,[38] stating that "section 284.7(d)(1) of the Commission's regulations[39] provides that rates for open access transportation separately identify costs attributable to transportation, storage and gathering."[40] The Commission reiterated its statement that it is "consistent with Order No. 436" to require Northern to state a gathering rate "so that shippers can be apprised of the total cost of services they plan to purchase."[41] The Commission also reiterated that there was no record to determine whether the services at issue actually consisted of gathering or of transportation. The Commission addressed jurisdiction no further but concluded with a statement which Northern interpreted as an assertion of jurisdiction to regulate gathering rates under the "just and reasonable" standards of NGA Secs. 4 and 5: "The Commission, however, is unable to determine the lawfulness of Northern's gathering rates until it files revised tariff sheets in compliance with this order."[42]
 
 
 37
 On November 27, 1989, Northern filed with the Commission a tariff which complied with the orders by stating gathering rates, but included a footnote which stated that the gathering rates were listed for information purposes only, that Northern reserved the right to change the rates, and that Northern did not imply consent to or recognition of Commission jurisdiction over gathering rates.[43]
 
 
 38
 While awaiting the Commission's decision on this compliance filing, Northern filed a petition for review[44] by this Court of the Commission's previous two orders to state gathering rates.[45] We held Northern's appeal in abeyance pending the Commission's decision on the supposed jurisdictional issue.
 
 
 39
 In a January 28, 1988 letter order[46] the Commission staff's Director of the Office of Pipeline and Producer Regulation rejected the tariff filing (see note 38, supra ) as not in compliance with the two previous orders to state gathering rates. The Director, rejecting the filing, stated that the footnote was in "direct contravention of the Commission's requirement that rates charged under the open-access program be stated rates.... Northern's gathering rates have not been derived from the costs allocated to or the representative volumes associated with gathering service.... Accordingly, Northern's rate derivation must be revised."[47]
 
 
 40
 Northern appealed this order to the Commission,[48] again relying on Sec. 1(b), and on the same date, to comply with OPPR's letter order, filed a tariff with revised gathering rates[49] and without the footnote. The Commission accepted this tariff by letter order issued April 14, 1988[50] without prejudice to Northern's appeal of the director's action. Northern then requested rehearing of the April 14 order approving the tariff. Northern's appeal of the director's rejection of the first tariff and its request for rehearing on the Commission's approval of the second tariff (see note 43, supra ) continued to press Northern's objections to Commission jurisdiction to require it to file gathering rates as part of its jurisdictional transportation tariff, and to determine their lawfulness.
 
 
 41
 The Commission responded to Northern's February 26 Appeal From Staff Action (appealing OPPR's January 28 rejection of the tariff with the footnote, duplicated in note 38, supra ) and its Request for Rehearing on the Commission's April 14 order (appealing the Commission's acceptance of the tariff with the footnote removed, duplicated in note 43, supra ) in one June 15, 1988 Order Denying Appeal of Staff Action and Denying Rehearing.[51]
 
 
 42
 In the June 15 order, the Commission set forth its position on the Commission's jurisdiction to determine the lawfulness of Northern's gathering rates.
 
 
 43
 The Commission decided that "[e]ven assuming that Northern's service is gathering, the Commission has the jurisdiction to determine the justness and reasonableness of the rates, terms and conditions under which the gathering service is performed"[52] under Secs. 4 and 5 of the NGA.[53] The Commission stated that, at most, the Sec. 1(b) gathering exemption would exempt Northern's gathering service from the Commission's certificate jurisdiction under Sec. 7[54] of the NGA.[55]
 
 
 44
 Northern appealed the June 15 order to this court. Uncertain, however, whether the order constituted appealable final action for purposes of our review, Northern also filed a petition with the Commission for another rehearing. We held the appeal in abeyance, pending the outcome of the administrative petition for rehearing. The Commission denied rehearing on September 22, 1988,[56] and Northern appealed that decision to this Court. We consolidated the appeals from the June 15 and September 22 orders with the first appeal.
 
 
 45
 Where Does it Lead?
 
 
 46
 Given this factual and regulatory scenario as a starting point, we address these consolidated appeals with one discussion of one question: May the Commission, under the NGA's Secs. 4 and 5, regulate rates charged for gathering on the pipeline's own gathering facilities in connection with jurisdictional interstate transportation, notwithstanding the explicit Sec. 1(b) exclusion of gathering from the act?
 
 
 47
 The Commission points out the Supreme Court's admonition that "[e]xceptions to the primary grant of jurisdiction in the section [1(b) ] are to be strictly construed"[57] so that the broad purposes of the Act will not be compromised. This consideration provides an anchor for our analysis.
 
 Colorado Interstate
 
 48
 Both parties rely upon Colorado Interstate Gas Co. v. FPC.[58] The relevant holding was that the NGA "does not preclude the Commission from reflecting the production and gathering facilities of a natural gas company in the rate base and determining the expenses incident thereto for the purposes of determining the reasonableness of [sales] rates subject to its jurisdiction."[59] The Commission asserts that the present order is no different from the orders upheld in Colorado Interstate. We agree that it is not substantively different from the orders upheld in that case. For the Commission to regulate separately stated rates for gathering over the pipeline's own gathering lines performed in connection with further jurisdictional interstate transportation is the substantial equivalent of the control of rates for gathering upheld in Colorado Interstate. Section 1(b) grants jurisdiction over interstate transportation and over interstate sales in the same words. This is the basis of the Commission's most powerful argument, which we accept fully: Since Colorado Interstate permits the regulation of rates for gathering performed in connection with interstate sales, it would be inconsistent to hold that the Commission may not regulate rates for transportation over a pipeline's own gathering facilities performed in connection with admittedly jurisdictional interstate transportation.
 
 A Closer Look
 
 49
 Colorado Interstate Gas Co. and affiliated companies objected to accounting methods used by the Commission in setting the companies' rates for jurisdictional interstate sales of natural gas.
 
 
 50
 One aspect of the Colorado companies' complaint was that the Commission included all of their costs, including the costs of gathering, in setting the jurisdictional interstate sales rates. The companies argued that by adding a 6.5 percent return to all costs in setting an interstate sales rate, the Commission was effectively regulating rates for gathering, contrary to the provisions of Sec. 1(b). The companies wanted the Commission to allow in operating costs the "fair field price" or "fair market value, as a commodity, of the gas"[60] at the time it entered the interstate transmission lines.[61] Adding the same return to the market value at that point rather than to actual costs would of course produce a higher rate. The Court reiterated its statement from FPC v. Hope Natural Gas Co.[62] that "value is 'the end product of the process of rate-making not the starting point.' "[63]
 
 
 51
 The Court held that considering gathering costs in setting a sales rate was not precluded by Sec. 1(b).[64] Of course the Commission-approved sales rate was affected by the gathering rate the companies charged because the gathering charge was "bundled" into the sales rate. Therefore it would not be possible to set a sales rate without effectively including a gathering charge.
 
 
 52
 The Court held that the result produced by the Commission's method was the same as could be produced by the method preferred by the companies,[65] and reiterated its holding in Hope that it is "the result reached not the method employed which is controlling.... It is not theory but the impact of the rate order which counts."[66]
 
 
 53
 The Commission promulgated Order No. 436 to curtail "undue preference[s] ... prejudice[s] or disadvantage[s]"[67] in interstate transportation and sales.[68] Such discrimination by pipelines is forbidden by NGA Sec. 4(b) in both interstate transportation and sales.
 
 
 54
 Permitting a pipeline to manipulate the otherwise unregulated charges for gathering services performed over its own facilities in connection with jurisdictional interstate transportation, would, in effect, permit the pipeline to establish rates for the interstate transportation. Thus, the pipeline could grant forbidden preferences in interstate transportation for its own gas, to the disadvantage of third-party shippers. By setting transportation rates at levels which give an advantage to the pipeline's own gas, while making the total transportation charges incurred by third-party shippers so high as to render their gas sales prices non-competitive, the pipeline can also create an "undue preference or advantage"[69] for its own jurisdictional interstate gas sales to the "undue prejudice or disadvantage"[70] of the interstate gas sales of third-party shippers.
 
 
 55
 The detrimental effects of these undue preferences reach beyond the third-party shippers. The public, the ultimate consumer, suffers from the reduced competition in the interstate sale of natural gas. This defeats the Commission's purpose in promulgating Order No. 436, and is contrary to the purposes and explicit provisions of the NGA and the pro-competitive goals of the NGPA.
 
 
 56
 The Supreme Court addressed just this potential in Interstate Natural Gas Co. v. FPC,[71] stating that "unreasonable charges exacted at this [gathering] stage of the interstate movement become perpetuated in large part in fixed items of cost which must be covered by rates charged subsequent purchasers of the gas, including the ultimate consumer. It was to avoid such situations that the Natural Gas Act was passed."[72]
 
 Regulatory Gap
 
 57
 The Supreme Court in FPC v. Transcontinental Gas Pipe Line Corp.[73] (Transco ), said that in resolving borderline cases not covered by explicit congressional authority, the comprehensive regulatory scheme[74] of the NGA dictates that "we must ask whether State authority can practicably regulate a given area and if we find that it cannot, then we are impelled to decide that federal authority governs."[75] The issue at hand, however, is covered by explicit congressional authority.
 
 
 58
 Our statutory construction of the Commission's power is therefore properly guided not by the regulatory gap theory, but by the admonition in Phillips Petroleum Co. v. Wisconsin,[76] that "[e]xceptions to the primary grant of jurisdiction in the section [1(b) ] are to be strictly construed."[77]
 
 
 59
 What Is Excluded From FERC Regulation by Sec. 1(b)?
 
 
 60
 In Interstate Natural Gas Co. v. FPC,[78] the Supreme Court held that the Sec. 1(b) gathering exclusion could not exempt a company's jurisdictional sales for resale in interstate commerce.
 
 
 61
 Giving full play to the Sec. 1(b) exemption of gathering, the Court confined it to matters of state and local concern: "Clearly, among the powers thus reserved to the States is the power to regulate the physical production and gathering of natural gas in the interests of conservation or any other consideration of legitimate local concern."[79]
 
 
 62
 In FPC v. Panhandle Eastern Pipe Line Co.,[80] which involved an attempt by the Commission to prevent a transfer of gas leases, the Court held that the gathering and production exemptions applied to producing and gathering facilities, including leases.
 
 
 63
 In Northern Natural Gas Co. v. State Corporation Comm'n,[81] the Supreme Court explicitly held that the gathering and production exemptions of Sec. 1(b) are limited to the physical activities of gathering and production. The Court stated, "[i]n a line of decisions beginning with Colorado Interstate Gas Co. v. Federal Power Com. ... and Interstate Natural Gas Co. v. Federal Power Com. ..., it has been consistently held that 'production' and 'gathering' are terms narrowly confined to the physical acts of drawing the gas from the earth and preparing it for the first stages of distribution."[82]
 
 
 64
 Our decision today is narrowly confined to rates for gathering by an interstate pipeline over its own lines in connection with jurisdictional interstate transportation. Neither gathering facilities nor the physical activity of gathering is affected.
 
 No Support for Northern's Position
 
 65
 Northern cites and quotes from numerous other cases for the proposition that the Commission may never regulate any gathering rates. Although the Sec. 1(b) exclusion of gathering is frequently discussed, on close examination none of the cases supports Northern's position.
 
 
 66
 Northern quotes the Supreme Court in Panhandle Eastern Pipe Line Co. v. Public Serv. Comm'n:[83]
 
 
 67
 Three things and three things only Congress drew within its own regulatory power, delegated by the Act to its agent, the Federal Power Commission. These were: (1) the transportation of natural gas in interstate commerce; (2) its sale in interstate commerce for resale; and (3) natural gas companies engaged in such transportation or sale.[84]
 
 
 68
 The Court in Panhandle upheld State power to regulate direct industrial sales. The scope of the Commission's power under the inclusive "in connection with" language of Secs. 4 and 5 was not at issue. The quoted passage continues:
 
 
 69
 The omission of any reference to other sales, that is, to direct sales ... was not inadvertent....
 
 
 70
 The line of the statute was thus clear and complete. It cut sharply between sales for resale and direct sales for consumptive uses.[85]
 
 
 71
 The clear and complete line cutting sharply between direct sales and sales for resale is not the aspect of the statute at issue here as it was in Panhandle. In the case at hand, we address the nexus between the Sec. 1(b) exclusion of gathering and the Secs. 4 and 5 authority to regulate services in connection with jurisdictional transportation. Panhandle involved no such nexus or overlap between authority granted and that withheld. Thus, the language Northern quotes out of context is not helpful to us.
 
 
 72
 The Panhandle Court did, however, emphasize the congressional purpose, in enacting the NGA, of creating a comprehensive regulatory scheme with both federal and state spheres of authority.[86] The scheme created no conflict or no man's land between state and federal authority. As in that case, "The attractive gap which appellant has envisioned in the coordinate schemes of regulation is a mirage,"[87] and Northern's rates are subject to regulation.
 
 
 73
 A case entirely unhelpful to Northern is Phillips Petroleum Co. v. Wisconsin.[88] In that case, the Supreme Court imposed NGA price controls on the wellhead sales for resale in interstate commerce of independent producers. Prior to Phillips, many--in and out of government and the gas industry--thought that the NGA was to apply only to interstate pipelines and that the Commission could not regulate the interstate sales of producers because of the production exemption. In Phillips then, as here, there was an overlap between a grant of authority and the Sec. 1(b) exclusions. There, as is appropriate here, the granted power was held not to be subordinate to the exclusion.
 
 
 74
 Northern cites the following language from Mobil Oil Corp. v. FPC:[89]
 
 
 75
 As this Court has noted, however, "Congress did not give the FPC carte blanche to take whatever action it might consider appropriate in furtherance of" the objectives of the Act. The Commission cannot gain jurisdiction over an activity simply by characterizing it as part of a "total transaction" of which another part happens to be subject to the FPC's control.[90]
 
 
 76
 First, Mobil involved the Commission's assertion of jurisdiction to set rates for transportation of liquid hydrocarbons, which are not in any way subject to the NGA's comprehensive scheme.
 
 
 77
 More significant, the Commission has by its orders and regulations demonstrated that "in connection with" interstate transportation, regulation of the charges made by the pipeline for gathering over its own facilities is essential to prevent discrimination against third-party gas in interstate transportation and sales.
 
 
 78
 This precisely overcomes the negative implication of the words in Mobil. The Court there said:
 
 
 79
 We are not confronted with a case where the Commission has demonstrated that rate jurisdiction over liquids is necessary to preserve its rate jurisdiction over natural gas.[91]
 
 
 80
 Jurisdiction over rates for gathering, when performed by an interstate pipeline over its own facilities in connection with jurisdictional interstate transportation, is necessary to preserve the Commission's Secs. 4 and 5 responsibility to prevent discrimination against shippers who must depend on monopolistic pipelines for transportation.
 
 In the Tenth Circuit
 
 81
 All of the arguments presented to us were recently urged on the Court of Appeals for the Tenth Circuit in Northwest Pipeline Corp. v. FERC.[92] The Court in Northwest, however, expressly declined to address the argument that Secs. 4 and 5 of the NGA grant FERC any authority over charges for gathering.[93]
 
 
 82
 In that case, the Commission had determined that the facilities at issue were interstate transportation facilities subject to its rate regulatory jurisdiction under Sec. 1(b). Here, however, the Commission found it unnecessary to determine whether Northern's facilities are gathering facilities as such or interstate transportation facilities, because it asserted the right to regulate the rates "even assuming" the facilities are gathering facilities as referred to in Sec. 1(b).
 
 
 83
 Declining to address the Commission's Secs. 4 and 5 argument, the Court in Northwest simply reversed and remanded because of the Commission's failure to apply its own "primary function test" in determining whether the facilities were interstate transportation facilities or gathering facilities.
 
 
 84
 There is no conflict between that Court's opinion and the theory of our decision. We determine precisely the issue that Court declined to decide. We do not wait for the Commission to determine finally whether the pipeline's facilities are or are not Sec. 1(b) gathering facilities.
 
 The Importance of Being Direct
 
 85
 Much energy is expended by the parties in arguing whether the Commission is indirectly regulating gathering charges here, as in Colorado Interstate, or directly regulating. While the Commission acts more directly on the gathering rates at issue here, it acted on gathering charges in Colorado Interstate by setting sales rates for which charges for gathering necessarily had to be considered.
 
 
 86
 It doesn't matter. The distinction between the direct and indirect action is a formalism which is not related to the Congressional grants of authority of the NGA or the holding in Colorado Interstate. It does not imply, nor does Colorado Interstate stand for the proposition that, for the Commission to properly regulate rates for gathering over the pipeline's own facilities in connection with jurisdictional transportation, it must do so only in some indirect manner. The "in connection with" language of Secs. 4 and 5 indicates that Congress, in devising the regulatory scheme, did not draw a formalistic line between direct and indirect regulation. The Congress foresaw the Commission's need for the ability to regulate other aspects of the natural gas industry as necessary to make effective its primary control over interstate transportation and sales. The Secs. 4 and 5 grant of authority to regulate "in connection with" interstate sales and transportation is not a grant of authority to regulate only by indirect means.
 
 
 87
 Under the circumstances of this case, which are nearly identical to those of Colorado Interstate, Sec. 1(b) does not forbid the Commission from more directly exercising the authority granted in Secs. 4 and 5. It is insignificant that transportation rather than sale is the service involved or that the rate for gathering is to be stated separately rather than "bundled." Stating the gathering rate separately from the related jurisdictional transportation rate does not magically "unbundle" the actual gathering activity performed over the pipeline's own facilities in connection with continuing interstate transportation.Selective Regulation
 
 
 88
 While carefully avoiding an explicit charge that there is a denial of constitutionally required Equal Protection in the regulatory scheme of the NGA and the NGPA, Northern comes close. Northern complains that the Commission's exercise of authority to regulate its gathering rates was selective in that interstate pipelines, but not producers or independent gatherers, are covered.
 
 
 89
 The question is not before us of whether gathering performed by producers or independent gatherers for transportation in interstate commerce by an interstate pipeline is sufficiently connected to interstate transportation to justify rate regulation under Secs. 4 and 5. We need not decide.
 
 
 90
 The Commission explains why its orders here do not, as asserted by Northern, constitute discriminatory treatment of pipelines.
 
 
 91
 First, the Commission explains, producers and others making "first sales" under Sec. 2(21) of the NGPA,[94] are subject to separate regulations under Sec. 110 of the NGPA,[95] covering production-related costs. Therefore it is not correct to say that gathering by producers is not subject to any regulatory scrutiny. Also, where producers' sales (including gathering) are not subject to regulatory controls, it is due to congressional action in excluding some sales from regulation under the NGPA.
 
 
 92
 Further, there is strong potential for anticompetitive abuses where the company performs both the gathering and the transportation, which do not exist for independent gatherers or producers. Where the gathering is independently performed, the pipeline's opportunity to manipulate transportation access and prices through the mechanism of controlling the price of gathering does not exist. The orders under review here address that specific problem.
 
 
 93
 The power we recognize here granted by Secs. 4 and 5 does not extend to the physical gathering process, including such matters as "physical activities, facilities, and properties used in the [production and] gathering of natural gas."[96] Those activities are within the purview of the states; the exercise of Federal power would be an unnecessary interference in the affairs of states and localities.[97] This case, however, involves interstate rates for which no local interest attaches and to which the states could not constitutionally or practicably exercise regulatory power.[98] Therefore no conflict with local authority exists.
 
 
 94
 The Commission's orders forestall an obvious opportunity for jurisdictional interstate pipelines to discriminate and create undue preferences in favor of their own gas in both jurisdictional interstate transportation and sales at the expense of the procompetitive purposes of the NGA, the NGPA and the Commission's Order No. 436, to the ultimate disadvantage of the ultimate consumers of gas, and in violation of the explicit provisions of Sec. 4 of the NGA.
 
 
 95
 We therefore hold the Commission's orders are valid.
 
 
 96
 AFFIRMED.
 
 
 
 *
 The Honorable John R. Brown, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation
 
 
 [1]
 Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol, 50 Fed.Reg. 42,408 (Oct. 18, 1985), FERC Stats. & Regs., Regulations Preambles 1982-1985 para. 30,665 (1985), (codified as amended in scattered sections of 18 C.F.R. Parts 2, 157, 284, 375, and 381) (final rule and statement of policy), reh'g granted in part and denied in part, Order No. 436-A, 50 Fed.Reg. 52,217 (1985), FERC Stats. & Regs., Regulations Preambles 1982-1985 para. 30,675; reh'g granted in part, Order No. 436-B, 51 Fed.Reg. 6,398 (1986), FERC Stats. & Regs. para. 30,688; reh'g denied, Order No. 436-C, 51 Fed.Reg. 11,566 (1986), 34 F.E.R.C. para. 61,404; reh'g denied, Order No. 436-D, 51 Fed.Reg. 11,569 (1986), 34 F.E.R.C. para. 61,405; reconsideration denied, Order No. 436-E, 51 Fed.Reg. 1,156 (1986), 34 F.E.R.C. para. 61,403; vacated and remanded, Associated Gas Distributors v. FERC, 824 F.2d 981 (D.C.Cir.1987), cert. denied sub nom. Interstate Natural Gas Ass'n of Am. v. FERC, 485 U.S. 1006, 108 S.Ct. 1468, 99 L.Ed.2d 698 (1988); readopted on an interim basis on remand, Order No. 500, 52 Fed.Reg. 30,334 (Aug. 14, 1987), FERC Stats. & Regs., Regulations Preambles para. 30,761, extension granted, Order No. 500-A, 52 Fed.Reg. 39,507 (Oct. 22, 1987), FERC Stats. & Regs., Regulations Preambles para. 30,770, modified, Order No. 500-B, 52 Fed.Reg. 39,630 (Oct. 23, 1987), FERC Stats. & Regs., Regulations Preambles para. 30,772, modified further, Order No. 500-C, 52 Fed.Reg. 48,986 (Dec. 29, 1987), FERC Stats. & Regs., Regulations Preambles para. 30,786 (1987), modified further, Order No. 500-D, 53 Fed.Reg. 8,439 (Mar. 15, 1988), FERC Stats. & Regs., Regulations Preambles para. 30,800, reh'g denied, Order No. 500-E, 53 Fed.Reg. 16,859 (May 12, 1988), 43 F.E.R.C. para. 61,234, modified further, Order No. 500-F, 53 Fed.Reg. 50,924 (Dec. 19, 1988), FERC Stats. & Regs., Regulations Preambles para. 30,841 (1988), reh'g denied, Order No. 500-G, 54 Fed.Reg. 7,400 (Feb. 21, 1989), 46 F.E.R.C. para. 61,148 (1989), remanded, American Gas Ass'n v. FERC, 888 F.2d 136 (D.C.Cir.1989), readopted, Order No. 500-H, 54 Fed.Reg. 52,344 (Dec. 21, 1989), FERC Stats. & Regs., Regulations Preambles para. 30,867 (1989) (Final Rule), modified, Order No. 500-I, 55 Fed.Reg. 6,605 (Feb. 26, 1990), FERC Stats. & Regs. para. 30,880 (1990), aff'd in part and remanded in part, American Gas Ass'n v. FERC, 912 F.2d 1496 (D.C.Cir.1990), cert. denied sub nom. Willcox v. FERC, --- U.S. ----, 111 S.Ct. 957, 112 L.Ed.2d 1044 (1991) [hereafter Order No. 436]
 
 
 [2]
 As used herein, the expression "gathering facilities owned by the pipeline" and all substantially similar expressions are intended to include such facilities owned or operated directly or indirectly by a pipeline or its parent, affiliate, subsidiary or lessors
 
 
 [3]
 15 U.S.C. Secs. 717-717z (1988)
 
 
 [4]
 15 U.S.C. Secs. 3301-3432 (1988)
 
 
 [5]
 FERC regulation under the NGA includes control of market entry by issuing certificates of public convenience and necessity authorizing sale or transportation of natural gas (NGA Sec. 7, 15 U.S.C. Sec. 717f), and control of market exit by granting permission to abandon certificated service (id.). Regulation also includes control over the price and other terms of sales and transportation, to ensure that they are just and reasonable and non-discriminatory (NGA Secs. 4 & 5, 15 U.S.C. Secs. 717c and 717d)
 
 
 [6]
 See, e.g., Transcontinental Gas Pipe Line Corp. v. State Oil & Gas Bd., 474 U.S. 409, 422, 106 S.Ct. 709, 716-17, 88 L.Ed.2d 732, 744 (1986)
 
 
 [7]
 Order No. 436, supra note 1, at 42,412 (emphasis in original)
 
 
 [8]
 Id. at 42,421, 42,424
 
 
 [9]
 Id. at 42,493 (codified as amended at 18 C.F.R. Sec. 284.8(b) (April 1, 1990))
 
 
 [10]
 Id. See also id. at 42,427: "sections 4 [15 U.S.C. Sec. 717c(b) ] and 5 [15 U.S.C. Sec. 717d(a) ] of the NGA also prohibit unduly discriminatory or preferential practices by natural gas companies"; Mobil Oil Corp. v. FERC, 886 F.2d 1023, 1026 n. 7 (8th Cir.1989): "FERC adopted Order No. 436 because it determined that the refusal of a pipeline to transport natural gas for a third party, where such transportation would displace the pipeline's own sales in its capacity as a gas merchant, was 'unduly discriminatory' under Sec. 5 of the Natural Gas Act, 15 U.S.C. Sec. 717d."
 
 
 [11]
 See Order No. 436, supra note 1, at 41,421, 42,424-42,425, 42,430
 
 
 [12]
 Id. at 42,493 (codified as amended at 18 C.F.R. Sec. 284.7(d)). The rule also requires that "any rate filed for service subject to this section must be a one-part rate that recovers the costs allocated to the service...." Id
 
 
 [13]
 Mobil Oil Corp. v. FERC, 886 F.2d 1023, 1025 (8th Cir.1989)
 The order has spawned much controversy, as evidenced by its subsequent history, detailed supra, note 1. That history includes three remands for further proceedings by the Court of Appeals for the D.C. Circuit, which generally, however, upheld the order's substance. Those remands do not relate to the issue addressed here.
 
 
 [14]
 15 U.S.C. Sec. 717(b)
 
 
 [15]
 Id. (emphasis added)
 
 
 [16]
 15 U.S.C. Sec. 717c(a) and (b)
 
 
 [17]
 Id. (emphasis added)
 
 
 [18]
 15 U.S.C. Sec. 717c(c)
 
 
 [19]
 Id
 
 
 [20]
 15 U.S.C. Sec. 717c(d)
 
 
 [21]
 Id
 
 
 [22]
 15 U.S.C. Sec. 717c(e)
 
 
 [23]
 Id
 
 
 [24]
 15 U.S.C. Sec. 717d(a)
 
 
 [25]
 Id. (emphasis added)
 
 
 [26]
 See, e.g., EP Operating Co. v. FERC, 876 F.2d 46 (5th Cir.1989) for a more thorough discussion of the characteristics of a gathering facility
 
 
 [27]
 8 H. Williams & C. Meyers, OIL AND GAS LAW 406-07 (1987)
 
 
 [28]
 NGA Sec. 4(c)
 
 
 [29]
 NGA Sec. 16, 15 U.S.C. Sec. 717o
 
 
 [30]
 Groseclose v. Bowen, 809 F.2d 502, 505 (8th Cir.1987), (citing Young v. Community Nutrition Institute, 476 U.S. 974, 980, 106 S.Ct. 2360, 2365, 90 L.Ed.2d 959, 966 (1986))
 
 
 [31]
 Groseclose, 809 F.2d at 505 (citing Young, 476 U.S. at 980, 106 S.Ct. at 2364, 90 L.Ed.2d at 966 (quoting Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843-44, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694, 703 (1985))); Springdale Memorial Hosp. Assn., Inc. v. Bowen, 818 F.2d 1377, 1380 (8th Cir.1987); Missouri Pub. Serv. Comm'n v. ICC, 763 F.2d 1014, 1017 (8th Cir.1985)
 
 
 [32]
 Administrative Procedure Act, 5 U.S.C. Sec. 706(2)(A) (1988)
 
 
 [33]
 See Northern Natural Gas Co., 36 F.E.R.C. para. 63,024 at 65,083, 65,085-87 (July 17, 1986) (ALJ's Certification to Commission of Contested Offer of Settlement); Northern Natural Gas Co., 37 F.E.R.C. para. 61,272 at 61,812 (December 22, 1986) (Commission's Order Approving Contested Settlement as Modified)
 
 
 [34]
 Northern Natural Gas Co., 37 F.E.R.C. para. 61,272 (December 22, 1986) (Commission's Order Approving Contested Settlement as Modified)
 
 
 [35]
 Id. at 61,812-13: "Both staff and the indicated shippers point out that Northern failed to include in its Settlement, a separately stated rate for gathering service in conjunction with its open access transportation services...."
 
 
 [36]
 Id. (footnote omitted)
 
 
 [37]
 On January 21, 1987
 
 
 [38]
 Northern Natural Gas Co., 41 F.E.R.C. para 61,158 (November 9, 1987) (Commission's Order Granting in Part and Denying in Part Rehearing and Granting Clarification)
 
 
 [39]
 18 C.F.R. Sec. 284.7(d)(1) (1987) [footnote as in original]. Section 284.7(d)(1) provides:
 (d) Rate design--(1) Volumetric rates. Except as provided in Sec. 284.8(d), any rate filed for service subject to this section must be a one-part rate that recovers the costs allocated to the service.... Such rate must separately identify cost components attributable to transportation, storage and gathering costs.
 
 
 [40]
 Northern Natural Gas Co., 41 F.E.R.C. para. 61,158 at 61,399 (November 9, 1987) (Commission's Order Granting in Part and Denying in Part Rehearing and Granting Clarification) (footnote omitted)
 
 
 [41]
 Id. (footnote omitted)
 
 
 [42]
 Id. (emphasis added)
 
 
 [43]
 Northern's Original Sheet No. 4g.3 as filed November 27, 1987 reads:
 CURRENTLY EFFECTIVE RATES
 Charge Per MMBtu Per Gathering System
 Minimum Maximum
 ------------------------------------------------------
Field Gathering 1 $ .0150 $ .2202
1 Reflects Northern's gathering cost of service. Provided for informational
 purposes only and not as a limitation of prices which may be charged or to
 imply recognition of or assent to Commission jurisdiction over such
 activities.
 
 
 [44]
 The petition was docketed as Northern Natural Gas Co. v. FERC, No. 88-1042
 
 
 [45]
 Northern Natural Gas Co., 37 F.E.R.C. para. 61,272 (December 22, 1986) (settlement modification), and 41 F.E.R.C. para. 61,158 (November 9, 1987) (rehearing denied)
 
 
 [46]
 Northern Natural Gas Co., Ltr. Order, Docket No. RP85-206-030, (January 28, 1988) (Office of Pipeline and Producer Regulation)
 
 
 [47]
 Id
 
 
 [48]
 Appeal from Staff Action, Docket No. RP85-206-030 (February 26, 1988)
 
 
 [49]
 Northern's Original Sheet No. 4g.3 as filed February 26, 1988 reads:
 CURRENTLY EFFECTIVE RATES
 Charge Per MMBtu Per
 Gathering System
 Minimum Maximum
 ----------------------------
Field Gathering $ .0100 $ .1471
 This revised tariff was accompanied by a transmittal letter stating the changes were made under compulsion of the OPPR letter order.
 
 
 [50]
 Northern Natural Gas Co., 43 F.E.R.C. para. 61,158 (April 14, 1988)
 
 
 [51]
 Northern Natural Gas Co., 43 F.E.R.C. para. 61,473 (June 15, 1988)
 
 
 [52]
 Id. at 62,160 (emphasis added)
 
 
 [53]
 15 U.S.C. Secs. 717c and 717d
 
 
 [54]
 15 U.S.C. Sec. 717f
 
 
 [55]
 Northern Natural Gas Co., 43 F.E.R.C. para. 61,473 at 62,160 (June 15, 1988)
 
 
 [56]
 Northern Natural Gas Co., 44 F.E.R.C. para. 61,384 (September 22, 1988)
 
 
 [57]
 Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 679, 74 S.Ct. 794, 797-98, 98 L.Ed. 1035, 1046 (1954) (quoting Interstate Natural Gas Co. v. FPC, 331 U.S. 682, 690-91, 67 S.Ct. 1482, 1486-87, 91 L.Ed. 1742, 1748 (1947))
 
 
 [58]
 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed. 1206 (1945)
 
 
 [59]
 Id. at 603, 65 S.Ct. at 839, 89 L.Ed. at 1223
 
 
 [60]
 Id. at 600, 65 S.Ct. at 838, 89 L.Ed. at 1222
 
 
 [61]
 Id. See also Colorado Interstate Gas Co. v. FPC, 142 F.2d 943, 955-56 (1944), aff'd, 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed. 1206 (1945)
 
 
 [62]
 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944)
 
 
 [63]
 Colorado Interstate, 324 U.S. at 601, 65 S.Ct. at 838, 89 L.Ed. at 1222 (citation omitted)
 
 
 [64]
 Id. at 603, 65 S.Ct. at 839-40, 89 L.Ed. at 1223
 
 
 [65]
 Id
 
 
 [66]
 320 U.S. at 602, 64 S.Ct. at 288, 88 L.Ed. at 345
 
 
 [67]
 NGA Sec. 4(b)
 
 
 [68]
 Order No. 436, supra note 1, at 42,424
 
 
 [69]
 NGA Sec. 4(b)
 
 
 [70]
 Id
 
 
 [71]
 331 U.S. 682, 67 S.Ct. 1482, 91 L.Ed. 1742 (1947)
 
 
 [72]
 Id. at 693, 67 S.Ct. at 1488, 91 L.Ed. at 1749-50 (footnote omitted)
 
 
 [73]
 365 U.S. 1, 81 S.Ct. 435, 5 L.Ed.2d 377 (1961)
 
 
 [74]
 Id. at 28, 81 S.Ct. at 449-50, 5 L.Ed.2d at 394
 
 
 [75]
 Id. at 19-20, 81 S.Ct. at 445, 5 L.Ed.2d at 390
 
 
 [76]
 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954)
 
 
 [77]
 Id. at 679, 74 S.Ct. at 797, 98 L.Ed. at 1046 (quoting Interstate Natural Gas Co. v. FPC, 331 U.S. 682, 690-91, 67 S.Ct. 1482, 1487, 91 L.Ed. 1742, 1748 (1947))
 
 
 [78]
 331 U.S. 682, 67 S.Ct. 1482, 91 L.Ed. 1742 (1947)
 
 
 [79]
 Id. at 690, 67 S.Ct. at 1487, 91 L.Ed. at 1748 (emphasis added) (footnote omitted)
 
 
 [80]
 337 U.S. 498, 69 S.Ct. 1251, 93 L.Ed. 1499 (1949)
 
 
 [81]
 372 U.S. 84, 83 S.Ct. 646, 9 L.Ed.2d 601 (1963)
 
 
 [82]
 Id. at 90-91, 83 S.Ct. at 649-50, 9 L.Ed.2d at 606 (citations omitted)
 
 
 [83]
 332 U.S. 507, 68 S.Ct. 190, 92 L.Ed. 128 (1947)
 
 
 [84]
 Id. at 516-17, 68 S.Ct. at 195, 92 L.Ed. at 137
 
 
 [85]
 Id
 
 
 [86]
 Id. at 517, 520, 68 S.Ct. at 195-96, 196-97, 92 L.Ed. at 138, 139
 
 
 [87]
 Id. at 523, 68 S.Ct. at 198-99, 92 L.Ed. at 141
 
 
 [88]
 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954)
 
 
 [89]
 483 F.2d 1238 (D.C.Cir.1973)
 
 
 [90]
 Id. at 1248
 
 
 [91]
 Id. at 1247, 1249 (footnote omitted) (emphasis added)
 
 
 [92]
 905 F.2d 1403 (10th Cir.1990)
 
 
 [93]
 Id. at 1411 n. 23
 
 
 [94]
 15 U.S.C. Sec. 3301(21)
 
 
 [95]
 15 U.S.C. Sec. 3320
 
 
 [96]
 Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 678, 74 S.Ct. 794, 797, 98 L.Ed. 1035, 1046 (1954); see also Panhandle Eastern Pipe Line Corp. v. Public Serv. Comm'n, 332 U.S. 507, 68 S.Ct. 190, 92 L.Ed. 128 (1947)
 
 
 [97]
 Interstate Natural Gas, 331 U.S. 682, 690, 67 S.Ct. 1482, 1486-87, 91 L.Ed. 1742, 1748 (1947)
 
 
 [98]
 Id. at 690-91, 67 S.Ct. at 1486-87, 91 L.Ed. at 1748